COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

COMMONWEALTH FINANCIAL GROUP, INC., and Charles Paul Hoffecker, Defendants.

No. 92–6692–CIV.

United States District Court, S.D. Florida.

Dec. 28, 1994.

R. Lawrence Bonner, Miami, FL, for defendants.

Elisabeth Monaco, Washington, DC, for plaintiff.

## ORDER GRANTING MOTION FOR CONTEMPT

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon plaintiff Commodity Futures Trading Commission's ("CFTC") Motion for Order of Contempt Against Defendants and Modification of Order of Preliminary Injunction ("Motion for Contempt") filed on March 12, 1993. Defendants Commonwealth Financial Group (hereinafter "Commonwealth" or "defendants") and Charles Paul Hoffecker (hereinafter "Hoffecker" or "defendants") responded in opposition on April 7, 1993 and the CFTC replied on April 14, 1993. On December 28, 1994, the Court issued an Order granting judicial notice of evidence and testimony received and submitted as an offer of proof in prior proceedings.

### I. BACKGROUND

On July 13, 1992, the CFTC filed this action alleging that Commonwealth had violated and were continuing to violate sections 4b and 4c(b) of the Commodity Exchange Act

("Act"), 7 U.S.C. §§ 6b, 6c(b) (1988) and sections 33.7(f) and 33.10 of the Commission's Regulations ("Regulations"), 17 C.F.R. §§ 33.7(f), 33.10 (1992), by misrepresenting and omitting material facts in connection with the solicitation of commodity futures and options transactions. The Complaint also alleged that defendants had violated and were continuing to violate section 166.3 of the Regulations, 17 C.F.R. § 166.3 (1992), by failing to diligently supervise Commonwealth salespeople.

On August 10, 1992, the CFTC filed a Motion for Preliminary Injunction and Ancillary Equitable Relief requesting that Commonwealth and Hoffecker be enjoined from violating the aforementioned anti-fraud and supervisory provisions of the Act and Regulations. Thereafter, defendants agreed to and signed a consent to preliminary injunction on September 25, 1992, and on October 19, 1992, this Court issued an Order of Preliminary Injunction enjoining defendants from (1) making false and misleading written or oral statements, (2) omitting material facts, and (3) engaging in any other act, conduct, practice or omission set forth in the Complaint, in connection with the sale of commodity options or futures contracts.

On March 12, 1993, the CFTC filed a Motion for Contempt alleging violations of the Preliminary Injunction by Commonwealth and Hoffecker. On August 31, 1994, the Court granted the CFTC's Motion to Supplement Motion for Contempt and deferred ruling on the motion until after hearing.[1] A hearing was held on October 4, 1994 and the Court took the matter under advisement.[2] The CFTC alleges that defendants continued to violate the Act and Regulations after the Order of Preliminary Injunction was executed. The CFTC is seeking relief in the form of sanctions, including (1) a citation of contempt against defendants, (2) an order directing defendants to comply with the Order of Preliminary Injunction, (3) reasonable

attorneys' fees and costs incurred by the CFTC to enforce the Order of Preliminary Injunction, and (4) modification of the Order of Preliminary Injunction to prohibit defendants from soliciting new customers and (5) an order requiring defendants to notify all customers and prospective customers in writing of the pendency of this action, the Order of Preliminary Injunction, and any orders entered in connection with their motion to assure defendants' future compliance with the terms of the Order of Preliminary Injunction and to protect the public.[3]

## II. DISCUSSION

Courts have inherent power to enforce compliance with their lawful orders and to compensate parties for damages sustained as a result of noncompliance through civil contempt. *See Shillitani v. U.S.*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193–94, 69 S.Ct. 497, 500–01, 93 L.Ed. 599 (1949); *Citronelle–Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir.1991); *Piambino v. Bestline Products, Inc.*, 645 F.Supp. 1210, 1212 (S.D.Fla. 1986). In a civil contempt proceeding the party petitioning the Court has only to make a *prima facie* case that the respondent violated a prior court order. Thereafter, the burden shifts to the respondent to prove that he has not violated the prior order or that there exists a valid defense which justifies his noncompliance. *See CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir.1992); *Citronelle–Mobile Gathering, Inc. v. Watkins*, 943 F.2d at 1301; *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir.1990); *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir.1990); *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir.1989); *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir.1984); *Piambino*, 645 F.Supp. at 1213. Where the respondent fails to make a sufficient defense the Court may

---

1. The CFTC's supplement was filed on June 14, 1993 [DE 82].

2. On August 30, 1994, the Court also entered an Order of Final Judgment in favor of Commonwealth and Hoffecker.

3. The preliminary injunction, issued by this Court on October 19, 1992, terminated upon Final Judgment issued on August 30, 1994. Consequently, the CFTC's requests for relief numbered above as (2), (4) and (5), are DENIED as moot.

grant whatever remedial relief is necessary to effect compliance with its decree. *See McComb,* 336 U.S. at 193, 69 S.Ct. at 500; *E.E.O.C. v. Guardian Pools, Inc.,* 828 F.2d 1507, 1515 (11th Cir.1987).

## A. Standard for Civil Contempt

 To establish a *prima facie* case of civil contempt the petitioner must prove by clear and convincing evidence that the respondent violated a prior court order. *See Wellington Precious Metals, Inc.,* 950 F.2d at 1528–29; *Citronelle–Mobile Gathering, Inc. v. Watkins,* 943 F.2d at 1301; *Howard Johnson Co.,* 892 F.2d at 1516; *Jordan v. Wilson,* 851 F.2d 1290, 1292 (11th Cir.1988); *Hayes,* 722 F.2d at 725; *Piambino,* 645 F.Supp. at 1213. Unlike criminal contempt proceedings, the party petitioning the Court for civil contempt does not have to establish that respondent intended to violate, or willfully violated, the order. *See McComb,* 336 U.S. at 191, 69 S.Ct. at 499; *United States v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701–02, 91 L.Ed. 884 (1947); *SEC v. American Bd. of Trade, Inc.,* 830 F.2d 431, 441 (2nd Cir.1987); *Piambino,* 645 F.Supp. at 1213.

## B. The Order of Preliminary Injunction

The Order of Preliminary Injunction issued by this Court on October 19, 1992, enjoined defendants from

> Violating Sections 4b and 4c(b) of the Commodity Exchange Act, as amended, 7 U.S.C. §§ 6b, 6c(b) (1988), and sections 33.7(f) and 33.10 of the Commission's Regulations, 17 C.F.R. §§ 33.7(f), 33.10 (1992), by cheating or defrauding or attempting to cheat or defraud any other person, or deceiving or attempting to deceive any other person by any means whatsoever, including, but not limited to, making false and misleading written or oral statements, om-

itting material facts, or any other act, conduct, practice, or omission set forth in the Complaint, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, received in interstate commerce for the fulfillment thereof; and/or by cheating or defrauding or attempting to cheat or defraud any other person by any means whatsoever, in or in connection with an offer to enter into, the confirmation of, or the maintenance of, any commodity option transaction. . . .

The CFTC alleges that from the entry date of the Order of Preliminary Injunction, defendants continued to violate the anti-fraud provisions of the Act and Regulations by misrepresenting to customers (1) the risk of loss, (2) the likelihood of profits and (3) the trading experience and success of Commonwealth.

## C. Misrepresentations Concerning Risk of Loss

 The CFTC alleges that despite the Order of Preliminary Injunction, defendants continued to misrepresent both the risk associated with the options they recommended, and the extent to which losses could be limited by stop loss orders and other devices. The CFTC bases its allegations primarily upon tape recorded conversations of Commonwealth's salespeople[4] as well as declarations by Commonwealth customers and prospective customers.[5]

---

4. During October, 1992, defendants hired Parker, Maher & Associates ("Parker") to monitor the telephone solicitations made by Commonwealth's salespeople. Parker taped the conversations it selected to monitor and later prepared a detail of the same. Parker also completed a report for Commonwealth analyzing whether the presentations made by the company's salespeople were factually accurate, adequately disclosed profit and risk, and complied with federal com-

modities laws and the regulations of the National Futures Association. The CFTC supports its Motion for Contempt with reports prepared by Parker for the months of October 1992 through January 1992.

5. *See* Motion for Contempt, Exhibit B and Memorandum of Points and Authorities in Support of Plaintiff's Motion to Supplement Motion for Contempt, Exhibit A.

The CFTC alleges that Commonwealth salespeople violated the preliminary injunction after it was executed on October 4, 1992 by downplaying the risk of the particular options they recommended. The Court found numerous instances in which Commonwealth salespeople either failed to discuss risk, discussed risk only after the customer raised the issue, or significantly downplayed the risk associated with the purchase of commodity options or futures.[6]

The Court also found that while the preliminary injunction was in effect Commonwealth salespeople told customers and prospective customers that a certain percentage of their investment could be protected by the use of stop loss orders. A stop loss order is a market order which may or may not be executed at the requested price and, therefore, cannot guarantee protection against losses. Moreover, at Commonwealth, stop loss orders apply only to the money which actually goes into the market after commissions and trading fees are paid, not to the customer's entire investment. Nevertheless, Commonwealth salespeople stated that a customer's loss could be limited to a higher

---

6. The following examples are illustrative:

(1) Salesperson Peter Tust "made one pitch in which he discussed the profit potential ... without mentioning risk." Ex. A *Nov. Report* at 6.

(2) In two separate conversations with prospective customers, salesperson Ira Boshnack discussed profit potential, however, "[n]either conversation included a discussion of the associated risks." Ex. A *Dec. Report* at 2.

(3) In a solicitation by salesperson Joe Loish where he asked a current client to increase his position from two to ten contracts, "Joe discussed the significant profits to be gained from an additional eight contracts, but did not discuss the risk associated with those positions." Ex. A *Dec. Report* at 4–5.

(4) Salesperson Mike Rendina failed to include any reference to risk in a conversation with a prospective customer. "Mike simply called, indicated that the prospect could be earning very large returns within two months, and then stating [sic] that he would like the prospect to review his portfolio to determine how much he could invest." Ex. A *Dec.Report* at 5–6.

(5) In a solicitation by salesperson Doug Obenour involving unleaded gas options, "Doug never mentioned that there was risk involved with putting on the suggested additional positions. Doug consistently stressed the tremendous profit potential with the unleaded gas trade. This was an unbalanced solicitation." Ex. A *Jan. Sales Solicitation Detail* at A–12.

(6) During a solicitation in which salesperson Rob Vetere tried to persuade a client to invest in the unleaded gas market, "Rob ... stressed the massive profitability of the unleaded gas trade that he was recommending [but never mentioned risk]." Ex. A *Jan. Sales Solicitation Detail* at A–17.

(7) After being solicited by Commonwealth salesperson Max Goldstein, customer Joseph Perri opened an account on September 15, 1992. Perri stated that Goldstein "never explained to me the risks of investing in commodity options and futures. He made the investments he was recommending in heating oil and U.S. Treasury notes seem risk free." Perri Decl., Pl.Ex. B ¶ 6.

(8) Marvin Sheets testified that a telephone solicitation from Commonwealth salesperson Peter Turst [sic] included a "biased" and "high-pressured" discussion of available profits but "did not mention there being any risk with what he proposed." Sheets Decl., Pl.Ex. B ¶ 11–12.

(9) During a telephone sales pitch, salesperson Joe Loish "made the investment seem virtually risk-free, to the point that the prospect had to bring up the issue, telling Joe that it cannot be that easy...." Ex. A *Nov. Report* at 5.

(10) A conversation in which salesperson John Wilson pitched the sale of unleaded gas to a prospective customer "was filled with references to potential profit and the only discussion of risk appeared to come about as a result of the prospect inquiring about the corresponding risk involved." Ex. A *Jan. Sales Solicitation Detail* at A–18.

(11) During a telephone solicitation with salesperson Todd Thomas, customer William Anderson was told that "the risk would be small in an investment in commodity options with Commonwealth because of Commonwealth's expertise and management. Thomas spoke very little about the risk involved in commodity options, but talked a great deal about the $20,000 to $30,000 in profits I would made in one month on a $5,000 investment." W. Anderson Decl., Pl.Ex. B ¶ 7.

(12) In an attempt to convince customer Daniel Baltus to purchase heating oil options, salesperson Michael Staryk informed Mr. Baltus that he could lose his entire investment, but that "there was a remote possibility of losing everything" and "how can you lose when people are still buying heating oil?" Baltus Decl., Pl.Ex. B ¶ 5.

(13) Salesperson Doug Obenour's pitches "did stress the likelihood of possible profit is near-certain. His presentations also do not seem to make clear the extent of the risk associated with granting options. His customers did not appear to realize that they could lose more than their initial investment." Ex. A *Nov. Report* at 5.

(14) In response to a retired prospective customer's statement that a loss would hurt him more than someone who was not retired, salesperson Keith Gordon failed to inform the prospect that he could lose his entire investment stating instead that "I don't think that you'll lose money on this." Ex. A *Nov. Report* at 4.

percentage of their investment than a stop loss would protect even when executed at the designated stop price. The Court found several instances of misleading sales techniques involving risk protection through the use of stop loss orders and other devices.[7]

Plaintiffs contend that representations that a commodity investment is limited in risk are inherently fraudulent "[i]n light of the uncertainties of the marketplace" *Munnell v. Paine Webber Jackson & Curtis*, [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,313 at 32,863 (CFTC Oct. 8, 1986); *see Hall v. Paine Webber Jackson & Curtis*, [1986–1987 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 23,317 at 32,890 (CFTC Oct. 8, 1986), and that "[s]uch representations therefore directly violate Sections 4b and 4c(b) of the Act and Regulations 33.7 and 33.10." *See Kelley v. Carr*, 442 F.Supp. 346,

356 (W.D.Mich.1977), *aff'd in part, rev'd in part*, 691 F.2d 800 (6th Cir.1980)." Defendants concede that "a representation minimizing risk or asserting there is no risk in connection with futures trading would constitute a material misrepresentation of fact." However, defendants' urge that the same is "not necessarily true" with respect to purchasing options

> in that it is fundamental to the option process that risk *is* limited to the option transaction cost when *purchasing* puts or calls. It is the option premium, commission and transaction costs that are at risk, and nothing more.

Def.Mem.Opp. at 12. Defendants further contend that the three cases cited by plaintiffs to support its proposition are irrelevant

---

7. (1) During a telephone sales presentation, salesperson Jack Fernandez stated that his strategy lowers the risk in options trading by 50%. He repeatedly told the client that if the market went against them, the equity would not be lost. He said that a $33,000 profit was a "very conservative" projection, and if the client did not make a lot of money, he would be left with his original investment. Ex. A *Oct. Report* at 1.

(2) During a telephone sales presentation, salesperson Keith Gordon discussed limiting risk to 50% of the investment. (He also improperly selected profitable cotton trades to use in his presentations even though those trades were atypical—in fact, there were more unprofitable cotton positions than profitable.) Ex. A *Oct. Report* at 2.

(3) Salesperson Mike Staryk, Sr. regularly described a stop loss order as an "electronic, computer order" that protects one's equity. The October Parker report admonished Commonwealth that this issue had been discussed before and that "[a stop loss order] is a market order!" That's it. It is held in the floor trader's deck with all the other open orders. And I would think that after the complaining about fills I've heard from your AP's, that *they would not consider that very safe protection.* Ex. A *Oct. Report* at 2 (*emphasis added*).

(4) Salesperson Gloria Albino informed a prospect that he could lose his entire investment but "immediately followed by stating that Commonwealth tries to limit downside to fifty per cent using stops...." The Report also stated that Albino downplayed risk "excessively" talking only of risking half the investment while strongly emphasizing profit potential. Ex. A *Nov. Report* at 1.

(5) The tape of a telephone solicitation by salesperson Mark Coleman revealed that Coleman failed to inform the prospective customer that

when writing options, the client's risk is unlimited. "In the pitch we heard, the prospect had a hard time following the long list of percentages discussed by Mark and probably did not understand the unlimited risk of options." Ex. A *Nov. Report* at 3.

(6) Salesperson Keith Gordon informed prospective customers that the client's risk is limited to 50% through the use of stops. He apparently also failed to inform prospective investors that they could lose their entire investment. "This needs to be said before discussing managing risk with stops." Ex. A *Nov. Report* at 4.

(7) Salesperson Jamie Carroll told prospective clients that the investor's potential loss is limited to his investment and no more and that their investments could be limited to 50% through the use of sell stop orders. In another solicitation, Carroll "continuously discussed potential profit that could be made and did not mention that the prospect's entire investment is at risk." Ex. A *Jan. Sales Solicitation Detail* at A–5.

(8) During a solicitation salesperson Jack Fernandez "kept pointing out that the prospect would only be risking half of his investment through the use of 50% sell stop orders." Ex. A *Jan. Sales Solicitation Detail* at A–6.

(9) Salesperson Ray Jones told a prospective client that he "would only be risking 60% of his equity on this trade with the use of 60% sell stop orders." Ex. A *Jan. Sales Solicitation Detail* at A–7.

(10) After William J. Foxley declined Commonwealth's invitation to invest in the commodities market admitting that he was "scared," salesperson Alan Ader stated that "we all have fear," but we can limit your losses. "While that's not guaranteed, it's inconceivable." Stop-loss orders will cut your losses. We can put in stop-losses at a pre-set loss limit. Foxley Decl.Pl.Supp. Motion for Contempt, Ex. A ¶ 24.

because "none of them involve the purchase of options."

The Court need not decide whether or not representations that a commodity investment is limited in risk are inherently fraudulent where the purchase of options is involved. Assuming, *arguendo*, that defendants' analysis of the risk involved in the purchase of options is accurate, that is, that the risk is limited to the option transaction cost when purchasing puts or calls, the Court nevertheless finds them in violation of the Act and the preliminary injunction. Commonwealth salespeople, in several instances during the preliminary injunctive period, *failed to discuss any risk whatsoever* during telephone sales presentations taped by Parker. Standing alone, this evidence is sufficient to find a violation of the Act and consequently, a violation of the preliminary injunction. Further, the preliminary injunction expressly enjoined defendants from violating section 4b(c) of the Act and section 33.10 of the Regulations which make it unlawful to directly or indirectly "deceive or attempt to deceive any other person by any means whatsoever in connection with an offer to enter into . . . any commodity option transaction." 17 C.F.R. § 33.10. The Court finds that a salesperson's failure to discuss risk when attempting to sell commodities options constitutes an "attempt to deceive" [8] and, consequently, a violation of the Act and Regulations in contravention of the preliminary injunction.

### D. *Misrepresentations concerning the likelihood of profits*

■ The Parker Reports also reveal that Commonwealth salespeople made material misrepresentations to customers and prospective customers concerning the likelihood of profits from trading commodity options and futures contracts after the preliminary injunction became effective. Numerous examples can be found in the October 1992 through January 1993 Parker Reports including a salesperson's statement to a prospective customer that "a $33,000 profit was 'a very conservative' projection," (Ex. A *Oct.*

*Report* Fernandez), "a trade had an 85% chance of being profitable," (Ex. A *Oct. Report* Martorano), recommending a trade in the heating oil market is like "recommending a speculative stock where one could lose fifty percent [of the investment] but eighty-five percent of the time the recommendations [have] made money," (Ex. A *Nov. Report* Albino), "the likelihood of possible profit is near certain," (Ex. A *Nov. Report* Obenour), and "over the last seven years every $10,000 invested has netted an average of as much as $50,000 in profits based on the underlying futures." (Ex. A *Jan. Draft Detail* Jones). The Commonwealth salespeople have also told prospective customers that an additional position purchased "would ultimately mean $3–5,000 in profit," (Ex. A *Oct. Report* Vetere), and that "the risk of [the] trade turning out badly was minimal." (Ex. A *Nov. Report* Conrad).

Other examples of misrepresentations concerning profits include statements by salespeople that by buying options they will make a multiple in dollars profit for every move in the cash or futures prices.[9] Such statements are deceptive because the movement of the cash price or the underlying futures contract seldom produces a directly proportional increase in the value of the option on the futures contract. Because most options sold by Commonwealth customers are out-of-money options, Commonwealth customers have not realized profits without dramatic price increases in the underlying futures contract. The October 1992 Parker Report provided:

> [o]ne very big problem was an example Mike [Staryk] used that implied that investing in options provides the same return as entering the cash market and holding the cash product. The option cannot be described as moving point-for-point with the futures contract or the cash market!

(Ex. A. *Oct. Report* at 2). Parker warned Commonwealth that "brokers need to ensure that they do not state that the option invest-

---

8. The Court so finds, despite Commonwealth's compliance with the written disclosure requirements of 17 C.F.R. § 33.7.

9. *See* Ex. A *Oct. Report* Staryk; *Jan. Draft Detail* Obenour, Staryk; Ex. B W. Anderson Decl. ¶ 5.

ment will gain in direct correlation to the futures contract." (Ex. A *Oct. Report* at 3).

The Court finds that Commonwealth's predictions of profits exceed "mere optimism" and, indeed, violate sections 4b and 4c(b) of the Act and Regulations 33.7(f) and 33.10. *See Kelley v. Carr*, 442 F.Supp. at 356; *CFTC v. British Am. Commodity Options Corp.*, [1977–1980 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 20,662 at 22,701 (S.D.N.Y.1978); *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. 911, 916 (S.D.N.Y.1977); *In re British Am. Commodity Options Corp.*, No. 76–15 and 7–13, avail. on Westlaw FSEC–Admin. DATABASE, 1977 CFTC LEXIS 15, at *38 (CFTC Dec. 2, 1977). Combined with claims that risks are subject to specific limitations, they amount to guarantees of profitability prohibited under section 4b of the Act. *See Levine v. Refco, Inc.*, [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,488 at 3615 (CFTC July 5, 1989); *Keller v. First Nat'l Monetary Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep (CCH) ¶ 22,402 at 29,-823 (CFTC Oct. 22, 1984). Therefore, the Court finds that defendants' misrepresentations concerning profit potential violated the Act during the period of preliminary injunction.

### E. *Misrepresentations regarding experience and training*

Commonwealth salespeople also misrepresented or failed to disclose material facts about the trading experience and past success of themselves and Commonwealth. Customers and prospective customers have been told that some Commonwealth customers have recently doubled their money (Ex. A *Oct. Report* Kuhney), Commonwealth has the best track record in the industry and has made millions of dollars in profits for their customers with little risk (Ex. B Perri Decl. ¶¶ 4, 5), Commonwealth's heating oil recommendations have been "right on the money" (Ex. A *Oct. Report* Rosenberg), and that a particular salesperson had a lot of people making money. (Ex. B Baltus Decl. ¶ 5).

In addition to affirmative misrepresentations, Commonwealth salespeople have also improperly failed to disclose material facts about the trading experience and past successes of themselves and Commonwealth. Examples of information that would be relevant to a prospective customer's decision to invest are Commonwealth's 80% or greater failure rate on its trading recommendations [10] (Ex. C Cordo Dep. at 136) and that the majority of Commonwealth customers have lost all or substantially all of the money that they invested.

In some instances, Commonwealth salespeople have misrepresented to prospective customers that investment recommendations made by Commonwealth would have resulted in profits if the individual had only invested earlier.[11] One salesperson said that "if he had known [the customer] back in 1988, he could have made [the customer] a millionaire from trading soybeans." (Supp. Ex. A Foxley ¶ 7).

Misrepresentations regarding the trading record and experience of a firm or broker are fraudulent because past success and experi-

---

**10.** The Court acknowledges that defendants dispute the accuracy of this statement which was given under oath by its sales manager, William Scott Cordo (designated a "broker" in defendants' brief). Defendants allege that they are not *required* to inform prospective customers of losses. Plaintiffs do not specifically allege that Commonwealth salespeople are required to inform customers of losses. Plaintiffs suggest that it amounts to a misrepresentation when salespeople emphasize the profits enjoyed by Commonwealth customers without mentioning any of the losses. The Court agrees.

**11.** Parker specifically warned Commonwealth about such representations. In one instance, a salesperson informed a customer that Swiss Franc options purchased on October 1, 1992 would have been worth $22,500 on December 23rd. (Ex. A *Dec. Report* Harrison). After consulting the settlement prices on those days, Parker concluded that the maximum profit achievable would have been $8,550. In its Report, Parker stated that "[a]ny statement used in a solicitation must be verifiable, or it will be interpreted as a misrepresentation by regulatory auditors." (Ex. A *Dec. Report* at 3–4). However, the Parker Reports reveal that in January 1993, at least six similar misrepresentations were made. *See* Ex. A *Jan. Draft Detail* J. Boshnack, Ex. A *Jan. Draft Detail*, Staryk, Ex. A *Jan. Draft Detail* Moe, Ex. A *Jan Draft Detail* Obenour, Ex. A *Jan. Draft Detail* Reo, Ex. A *Jan. Draft Detail* Fernandez.

ence are material factors which a reasonable investor would consider when deciding to invest in commodity options through that firm or broker. *See Reed v. Sage Group,* [1987–1990 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 23,942 at 34,299 (CFTC Oct. 14, 1987); *In re Ferragamo,* [1986–1987] Comm.Fut.L.Rep. ¶ 23,795 at 34,103 (ALJ Aug. 14, 1987), *aff'd* [1987–1989 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,982 (CFTC Jan. 14, 1991); *In re Nelson, Ghun & Assocs.,* [1980–1982 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 21,395 (CFTC Feb. 22, 1982); *LeBallister v. Lincolnwood Commodities, Inc.,* [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,538 at 22,224 (CFTC Dec. 21, 1977). Failure to inform customers of these material facts while projecting large profits amounts to fraud. *Olson v. Ulmer,* [Current Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,987 at 37,627 (CFTC Jan. 13, 1991); *see In re Ferragamo,* ¶ 23,795 at 34,103. The Court therefore finds that defendants' misrepresentation and non-disclosure of such facts violated sections 4b and 4c(b) of the Act and section 33.10 of the Regulations. *See Kelley v. Carr,* 567 F.Supp. 831, 837 (W.D.Mich.1983); *CFTC v. J.S. Love & Assocs.,* 422 F.Supp. 652, 660 (S.D.N.Y. 1976); *Reed v. Sage Group,* ¶ 23,943 at 34,-299. Because these violations occurred between October 1992 and August 1994, defendants' actions constitute a violation of the Order of Preliminary Injunction.

### F. *Analysis*

■ Sections 4b(a) and 4c(b) of the Act provide, taken together and in pertinent part, that it is unlawful to "cheat or defraud" anyone, "willfully to make … any false report or statement," or "willfully to deceive or attempt to deceive" anyone in connection with a sale of any commodity option. Essentially, it prohibits commodities brokers from engaging in fraud or misrepresentation of material facts.

A violation of this anti-fraud provision can be found when the plaintiff has demonstrated:

(1) a material misrepresentation of presently existing or past fact, (2) knowledge of the falsity by the person making the misrepresentation, (3) intent that the misrepresentation be relied upon, and (4) reliance on the misrepresentation.

*C.F.T.C. v. American Metals,* 775 F.Supp. 767 (D.N.J.1991). *See also Puckett v. Rufenacht, Bromagen & Hertz, Inc.,* 903 F.2d 1014 (5th Cir.1990).

Based on the evidence cited above, the Court finds clear and convincing evidence that Commonwealth violated the anti-fraud provisions of the Act and Regulations during the period of preliminary injunction. Commonwealth has failed to discuss accurately the risks involved in commodities trading, or the potential profits thereof, and have incorrectly discussed stop loss orders with customers and prospective customers. The test for materiality is whether a reasonable investor would rely on the information in making a decision to invest. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *SEC v. Shapiro,* 494 F.2d 1301, 1305–06 (2d Cir.1974). Information regarding risk and profit potential is material because an investor would rely on such representations made by a broker in determining whether to invest. Furthermore, misrepresentations regarding the experience and trading success of Commonwealth and its salespeople meet the materiality test because clients or prospective clients are likely to rely on such a representation when deciding to invest with a particular company or through a particular salesperson.

■ While the CFTC has not presented any direct evidence concerning the intent of Commonwealth's directors or salespeople, the Court finds that the requirement of scienter[12] has been satisfied. First, it is undisputed that a high percentage of all commodities investors lose money. Further, as evidenced by the tapes and transcripts of sales solicitations, the brokers at Commonwealth are clearly aware of the significant losses suffered by many of their clients.

---

12. *See generally Hammond v. Smith Barney, Harris, Upham & Co., Inc., et al.,* Comm.Fut.L.Rep. (CCH) ¶ 24,617, 36,654 (CFTC March 1, 1990).

Moreover, the Parker Reports reveal that in many instances improper sales techniques recurred and were referenced from month to month during the preliminary injunction which leads the Court to conclude that defendants were cognizant of such improprieties. The Court therefore finds that although no evidence of the precise state of mind of Commonwealth's salespeople or managers was presented, the misleading information was given willfully.[13]

■ The Court finds that in an enforcement proceeding under section 4b(A) of the Act, reliance by customers is irrelevant. *In re Ferragamo*, 2 Comm.Fut.L.Rep. (CCH) ¶ 24,982 at 37,598 n. 16 (CFTC Jan. 14, 1991); *In re GNP Commodities*, 2 Comm. Fut.L.Rep. (CCH) ¶ 25,360 at 39,206, 39,218 (CFTC Aug. 11, 1992), *aff'd sub nom.; Monieson v. CFTC*, 996 F.2d 852 (7th Cir.1993).

In an enforcement proceeding, it is the actions of the defendant that are at issue, not the reliance or damage to particular customers. The fortuity of certain customers not to believe a broker's misrepresentation should not work to the advantage of one responsible for such misdeeds.[14]

■ At the close of the permanent injunction proceedings against the defendants, the Court found that Commonwealth brokers had made material misrepresentations in violation of section 4b of the Act. Despite these violations, the Court found insufficient evidence that future violations were likely to occur and consequently was unable to justify a permanent injunction enjoining Commonwealth from committing future violations. During trial, the CFTC submitted as an offer of proof evidence to show that Commonwealth and Hoffecker continued to violate the anti-fraud provisions of the Act and the Regulations after the filing of the Complaint. At that time, the Court refused to admit this evidence as it was not probative of activity by defendants which led to the filing of the CFTC's Complaint.[15] The Court's decision in the permanent injunction proceeding was based exclusively on evidence of activities occurring prior to the filing of this lawsuit. In contrast, the CFTC's Motion for Contempt requires this Court to focus on the events occurring after the execution of the Order of Preliminary Injunction. Based on these events, the Court finds clear and convincing evidence[16] that Commonwealth violated section 4b of the Act during the period of preliminary injunction. The Order of Preliminary Injunction effectively mandated that Commonwealth employ extraordinary efforts to avoid any violations of the injunction's provisions. Despite the gravity of a federal court order, however, it appeared to be "business as usual" at Commonwealth. As a result, defendants violated the Act and the preliminary injunction. The Court therefore finds the defendants in contempt of court.

### G. *Commonwealth is liable for the acts of its agents*

■ Section 2(a)(1)(A)(iii) of the Act provides, in pertinent part:

[the] act, omission, or failure of any official, agent, or other person acting for any indi-

---

**13.** To allege a section 4b violation, no "evil motive" is required. "It is enough that [the broker] acted *deliberately,* knowing that his acts were unauthorized and contrary to instructions. Such knowing, intentional conduct made his acts willful, and therefore his violations of the statutory prohibition against cheating or defrauding the customer were willful, in the accepted sense for infractions of this type." *Haltmier v. CFTC*, 554 F.2d 556, 562 (2d Cir.1977), citations omitted.

**14.** *See Findings of Facts and Conclusions of Law,* Aug. 30, 1994 at 15.

**15.** *See* Order of Findings of Fact and Conclusions of Law at 12 & n. 7 ([b]ased on the evidence presented, the Court finds that Commonwealth has violated the anti-fraud provision of the Act in several isolated instances. These include sales solicitations involving customer witnesses [which occurred prior to the commencement of this action]. T. Anderson and K. Anderson became customers of Commonwealth after the filing of the lawsuit, and the misrepresentation in their sales solicitation may be material to the contempt motion filed by the CFTC) (Aug. 30, 1994).

**16.** In this case, the Court accepted as evidence the Parker Reports and the sworn customer declarations. The Court fully considered defendants' objections to the customer declarations, however, the declarations were supported, for the most part, by the Parker Reports. Furthermore, the Court found violations of the preliminary injunction based on the Parker Reports alone.

vidual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 4 (1988). It is well settled law that this section applies broadly to all forms of principal-agent relationships. *In re Big Red Commodity Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,623, 30,666 (CFTC June 7, 1985), *aff'd*, 802 F.2d 963 (7th Cir.1986); *Berisko v. Eastern Capital Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,772 at 31,223; *Bogard v. Abraham–Reitz & Co.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) 22,273 at 29,292 (CFTC July 5, 1984).[17] Therefore, pursuant to section 2(a)(1)(A)(iii) of the Act, Commonwealth is responsible for the acts and omissions of its employees, and is consequently liable for the violations of the Act and Regulations which occurred during the period of preliminary injunction.

### H. *Hoffecker is liable as controlling person*

■ Plaintiff alleges that pursuant to sections 13(a) and 13(b) of the Act, defendant Hoffecker is liable for the violation of the Preliminary Injunction Order as both an aider and abettor, and as a controlling person. Defendants counter that Hoffecker took extraordinary steps "at great financial cost" to maintain an adequate system of supervision and "that such action was taken in good faith cannot be questioned."

Section 13(a) of the Act provides;

Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of a violation of any of the provisions of the Act, or any of the rules, regulations or orders issued pursuant to this Act, or who acts in combination or concert with any other person in any such violations, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or

another would be a violation of the provisions of this Act or any of such rules, regulations, or orders may be held liable for such violations as a principal.

7 U.S.C. § 13c(a) (1988). A person is liable under this provision of the Act if he knowingly associates himself with or participates in an unlawful venture and seeks by his actions to make it succeed. *In re Richardson Sec., Inc.*, [1980–1982 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 21,145 at 24646 (CFTC Jan. 27, 1981). Direct evidence of state of mind is not necessary. Knowing assistance is to be inferred from the surrounding facts and circumstances. *In re Premex*, [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,992 at 28,361 (CFTC Feb. 1, 1984) (*citing Costello v. United States*, 255 F.2d 389, 400 (8th Cir.1958), *cert. denied*, 358 U.S. 830, 79 S.Ct. 52, 3 L.Ed.2d 69 (1958)).

■ The Court finds insufficient evidence to hold Hoffecker liable as an aider and abettor. The CFTC has failed to show that Hoffecker knowingly associated himself with or participated in an unlawful venture as required for liability under section 13(a) of the Act. In fact, the evidence shows that Hoffecker took steps to prevent unlawful sales solicitation and in some cases disciplined salespeople who engaged in fraudulent practices. Next, there is insufficient evidence of active participation or of deliberate indifference concerning the violations discussed above.[18]

■ However, the Court finds Hoffecker liable as a controller for the violations of the Act during the preliminary injunctive period.

Section 13(b) of the Act provides:

Any person who directly or indirectly, controls any person who has violated any provision of this Act or any other rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.

---

**17.** *See also* H.R.Rep. No. 964, 97th Cong., 2nd Sess. 105 (1982) U.S.Code Cong. & Admin.News 1982, 3871, 3954.

**18.** The Court acknowledges plaintiff's allegation that Hoffecker improperly handled a customer complaint in October 1992.

7 U.S.C. § 13c(b) (1988). Section 13(b) further provides that the CFTC has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation. Among the factors which determine whether an individual is a controlling person under section 13(b) are whether he makes hiring and firing decisions, negotiates contracts, is present at the office, participates in advertising decisions, is responsible for payroll and the control of finances, and acts as a regulatory liason. *In re Matter of Spiegel,* [1987–1990 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988). A person is a controlling person under 13(b) if he had "actual or constructive knowledge of the core activities that constitute the violation[s] at issue and allowed them to continue." *Spiegel,* ¶ 24,103 at 34,767. If a controlling person knows that his subordinate is making misrepresentations and does not stop him, he possesses the requisite knowledge even if he is ignorant of the specific context in which those representations were made. *Spiegel,* ¶ 24,103 at 34,-767. A person may be deemed to have constructive knowledge when he lacks actual knowledge only because he consciously avoids it, such as when the evidence supports the inference that he has deduced the truth and is simply trying to give the appearance of, and avoid incurring the consequences of, such knowledge. *Spiegel* ¶ 24,103 at 34,767 n. 11 (*citing United States v. Ramsey,* 785 F.2d 184, 189 (7th Cir.1986) ("knowing" includes conscious avoidance")), *cert denied,* 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986); *see In re Apache Trading Corp.,* [1987–1990 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 24,413 (ALJ Mar. 20, 1989), *aff'd in part, rev'd in part,* [1990–1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,-251 (CFTC Mar. 11, 1992).

 The Court finds that Hoffecker is the preeminent controlling person at Commonwealth. Hoffecker became president of Commonwealth in 1991 and since that date has owned 100% of Commonwealth's stock.

As president, Hoffecker oversees the general business operations of Commonwealth, works full-time at the Commonwealth office, attends meetings with salespeople approximately twice weekly, conducts goal-setting meetings, is on the sales floor occasionally, spends time with salespeople in small group meetings in his office and acts as Sales Manager when William Cordo is out of the office. Hoffecker possesses the final decisionmaking authority in all hiring and firing decisions at Commonwealth, directly supervises managers responsible for monitoring salespeople and sets company policies and regulations concerning compliance procedures, discipline of salespeople, customer complaints and customer claims.

Hoffecker controls Commonwealth's finances and is responsible for the company's payroll. His is a signatory on the company's savings, checking and payroll bank accounts, and signs the paychecks issued to Commonwealth employees. He has also entered into "Branch Office Management Agreements" for or on behalf of Commonwealth, with Arnold Donner, Lee Greene, Harlen Perry, Greg Shausen, Philip Tuccelli, and Paul Zolden.

The Court further finds that once Hoffecker was *personally* named in the preliminary injunction, he was under a heightened standard to strictly comply with the Act and Regulations. To that end, Hoffecker should have gone beyond the ordinary precautions and safeguards against fraud normally expected of a company president. However, the Court perceived no significant business changes following the Order of Preliminary Injunction.[19]

The Court finds that Hoffecker, as the controlling person at Commonwealth during the preliminary injunction, is liable for the violations of the Act and Regulations that occurred during that time. Despite Hoffecker's actual and constructive knowledge of the fraudulent misrepresentations made by Commonwealth salespeople gained via the Parker Reports, he failed to stop his salespeople

---

19. The Court acknowledges that Hoffecker hired Parker to tape and analyze sales solicitations. Based on the recurrence of inappropriate sales techniques by Commonwealth brokers, however, Parker's recommendations apparently went unheeded. If action by Hoffecker was taken, it was insufficient to bring the company into compliance with the preliminary injunction.

from making misrepresentations during the preliminary injunction. In fact, the Court finds that Hoffecker allowed the misrepresentations to continue, despite the preliminary injunction, which makes him liable as a controlling person.

### III. CONCLUSION

THE COURT has considered the Motion and the pertinent portions of the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that the said Motion for Contempt be, and the same is hereby GRANTED. Plaintiff shall move for the amount of attorneys fees and costs and all other relief requested. Plaintiffs may also comment on the suitability of (1) a monetary fine and (2) a one-year requirement that defendants notify all customers and prospective customers of the Court's finding of contempt by providing such individuals with a copy of this Order or a comparable summary. Plaintiff shall submit a motion for relief on or before January 13, 1995.

DONE AND ORDERED.