OPINION
 

 MESSITTE, District Judge.
 

 1.
 

 The Commodity Futures Trading Commission (the “Commission”) has sued Noble Wealth Data Information Services, Inc. (“Noble Wealth”), Currex International Corporation (“Currex”), International Advanced Investments, Inc. (“LAI”), Bull & Bears, Ltd. (“Bull & Bears”), Noble Wealth Development, Ltd. (“Noble Wealth HK”), and Esfand Baragosh (“Baragosh”), an individual, for misappropriation of customer funds and fraud in violation of § 4(b)(a)(l)-(iii) of the Commodity Exchange Act (“the Act”), 7 U.S.C. § 6b(a) (Count I); bucketing customer orders in violation of § 4(b)(a)(iv) of the Act, 7 U.S.C. § 6b(a)(iv) (Count II); and selling illegal futures contracts in violation of § 4a of the Act, 7 U.S.C. § la(3) (Count III).
 
 [1]
 
 
 *680
 
 The Court has previously granted default judgments and entered a permanent injunction against Noble Wealth, Currex, and IAI. The claims against Bull
 
 &
 
 Bears and Noble Wealth HK have been dismissed without prejudice. The Court considers here the Commission’s Motion for Summary Judgment against Baragosh, as to whom it seeks permanent injunctive relief, restitution, disgorgement of profits, and a civil penalty.
 

 Having reviewed the pleadings and evi-dentiary record, except as to the request for disgorgement, the Court will GRANT the Commission’s Motion.
 
 [2]
 

 II.
 

 A.
 
 The Parties
 

 1. The Commission is an independent federal regulatory agency charged with the administration and enforcement of the Act. A fundamental purpose of the Act is to insure fair practice and honest dealings in commodity exchanges.
 
 Tamari v. Bache & Co. (Lebanon) S.A.L.,
 
 730 F.2d 1103, 1106 (7th Cir.), cert. denied, 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984). The Act seeks to protect all investors in commodities.
 
 Smith v. Groover,
 
 468 F.Supp. 105, 112 (N.D.Ill.1979).. ■
 

 2. Noble Wealth is or was a California corporation with its principal place of business in Bethesda, Maryland. It previously maintained offices in Atlanta, Georgia. Noble Wealth, also trading as Noble Wealth, Inc. and Nobel Wealth, Inc., has never been designated by the Commission as a contract market for the trading of foreign currency futures contracts nor has it ever been registered with the'Commission in any capacity.
 

 3. Currex is or was a Delaware corporation with its principal place of business in Duloth, Georgia. As of approximately June of 1998, Noble Wealth’s Atlanta, Georgia office merged its operations with Currex.
 

 4. IAI is or was a Delaware corporation with its principal place of business in Bethesda, Maryland. IAI occupied the same office as Noble Wealth in Bethesda. As with Noble Wealth, IAI has never been designated by the Commission as a contract market for the trading of foreign currency futures contracts nor has it ever been registered with the Commission in any capacity.
 

 5. Bull & Bears is or was a company registered with Companies House of the United Kingdom Financial Services Authority, with its principal place of business in London, England. Bulls & Bears has never been authorized to conduct investment business in the U.K.
 

 6. Noble Wealth HK is or was incorporated in Hong Kong. It is not a licensed foreign exchange broker with the Hong Kong Securities and Futures Commission.
 

 7. Esfand Baragosh, at all relevant times, was the manager of day-to-day operations and the registered agent for the Noble Wealth office located in Bethesda, Maryland. Previously he was the manager of day-to-day operations for the Noble Wealth office located in Atlanta, Georgia. As hereinafter more particularly described, Baragosh also functioned in similar capacities for Currex and IAI.
 

 B.
 
 Noble Wealth’s Initial Solicitation and Training Program
 

 1. Beginning no later than 1994, Bara-gosh, along with Noble Wealth, offered to provide members of the public with the means to buy and sell foreign currency contracts.
 

 2. Baragosh and Noble Wealth solicited foreign currency “traders” by placing help wanted advertisements in the
 
 Washington Post,
 
 the
 
 Atlanta Joumal-Consti-
 
 
 *681
 

 tution,
 
 and other newspapers. When individuals responded by calling the telephone number listed in the advertisements, Noble Wealth representatives invited them to visit Noble Wealth’s offices in Maryland or Georgia for a brief interview. During this interview, a Noble Wealth representative explained that the firm offered a trading program which taught the rudiments of trading currencies which would enable the job-seeker to conduct highly lucrative trading. According to Noble Wealth’s brochures, its access to the interbank market enabled it to obtain the “best buy-sell quotation for clients all over the world.”
 

 3. Nobel Wealth’s trading program consisted of four sessions, each lasting one or two hours, during which trainees would watch videotapes in which Baragosh described the mechanics of trading currencies through Noble Wealth and different trading techniques. In addition to the videotapes, Baragosh or another Noble Wealth instructor would explain to trainees that they could become traders by opening an account of $10,000. The instructor would urge the trainees to solicit their family and friends to open accounts and become “customers” of Noble Wealth.
 

 4. During these training sessions, Bar-agosh and other Noble Wealth instructors provided trainees with brochures that projected investment returns of “31.15%” in a matter of days, “192.5%” in one month, “906%” in three months, or “532%” in six months. The brochures also made favorable comparisons between foreign currency trading and investments in stocks and mutual funds.
 

 5. The brochures represented that Noble Wealth customer accounts would be managed by “highly trained investment consultants” and that trades would be placed through Noble Wealth HK, a Hong Kong corporation purporting to be a “Licensed Financial Brokerage House with daily turnovers in excess of 100 million dollars,” and said to be the Macau subsidiary of Bull & Bears, a British company.
 

 6. Noble Wealth and Baragosh encouraged traders to use these brochures and other documents as tools for soliciting friends and family to invest with Noble Wealth. Noble Wealth and Baragosh provided traders with telephone scripts to use when soliciting potential customers.
 

 7. Friends and family of the traders were thus subjected to the same claims that Noble Wealth used to lure traders into its scheme.
 

 8. All the claims described in subpara-graphs B(2)(3)(4) and (5), supra, were false. The record shows that Noble Wealth’s investors had not achieved extraordinary profits. Indeed, all of Noble Wealth’s investors had lost the bulk of their investments.
 

 9. Although Noble Wealth issued account statements to traders and customers reporting trading losses, spread fees, daily interest fees and commissions, and other account activity, Noble Wealth in fact failed to purchase foreign currency contracts on behalf of its customers. The account statements issued by Noble Wealth were therefore fictitious.
 

 10. Noble Wealth HK was not a licensed financial brokerage house in either the United States or Hong Kong and Noble Wealth’s “highly trained investment consultants” had attended only four training sessions which, taken together, amounted to less than a single eight-hour day.
 

 11. In marked contrast, Christopher Maher, an expert in foreign exchange currency markets (“Expert Maher”), testified at the preliminary injunction hearing in this case that a trader of foreign currencies on the interbank market — normally the foreign currency desk of an investment bank — must typically spend several months to several years apprenticing with a senior trader before being permitted to trade currencies.
 

 
 *682
 
 C.
 
 Noble Wealth’s Trading Operation
 

 12. After Noble Wealth’s trainees completed their four training sessions and raised $10,000 for their own accounts or solicited at least $10,000 from other customers, they were permitted to trade Noble Wealth’s foreign currency contracts using Noble Wealth’s trading operation.
 

 13. Noble Wealth’s trading operation was organized and operated according to its own rules and regulations. It established the trading hours for its facility; determined the terms of the currency contracts that were traded at its facility; dictated the sizes' of the contracts to be traded; offered leveraged foreign currency contracts and established the initial margin requirements for its contracts. Noble Wealth also determined the potential duration of the contracts, allowing them to be held open indefinitely.
 

 14. The trading day at Noble Wealth ran from 8 p.m. until 3 p.m. the following day.
 

 15. Noble Wealth offered contracts in four major foreign currencies denominated against the U.S. dollar: German Deutsche-marks, Swiss Francs, Japanese Yen and British Pounds. The Deutschemark, Franc and Yen contracts were traded in increments of $100,000 and the Pound contracts in increments of $50,000.
 

 16. Investors were permitted to purchase these contracts on leverage. Noble Wealth required investors to make a down-payment on the contract (initial margin) of $1,000 for day trades and $2,000 for trades held open for more than one day; If the market moved against a customer’s position, Noble Wealth required the customer to invest additional funds (maintenance margin).
 

 17. Customers closed out their positions in Noble Wealth contracts by entering into offsetting transactions. For example, if a Noble Wealth “trader”-purchased a Yen contract, the contract could be offset by selling a Yen contract.
 

 18. In Noble Wealth’s Maryland offices, traders sat in a large central area of the business premises where they watched computer monitors displaying quotation services that reported the prices of various foreign currencies.
 

 19. When the trader saw a desirable price, the trader filled out a Noble Wealth order ticket describing the number of contracts to be bought or sold, the foreign currency to be traded, the price reflected on the computer monitor and whether the order was a stop-loss or limit order.
 

 20. ' After completing the order ticket, the trader brought the ticket to the Noble Wealth dealer who was located in the dealing room of the Noble Wealth facility, a small room separated from the trading floor by a glass window. The trader then slid the order ticket under the window to the dealer.
 

 21. The dealer claimed to place a telephone call to Noble Wealth HK to obtain a price quote and thereafter relayed the price quote to the trader. The trader had only a few seconds to decide whether to execute the trade.
 

 22. If the trader accepted the price, the dealer completed the" order ticket by filling in the execution price for the trade.
 

 23. In a recent arbitration proceeding between Noble Wealth and an investor, Baragosh testified that Noble Wealth did not actually place all of its customers’ traders on the interbank market. According to Baragosh, what Noble Wealth’s Maryland office did was to pass its traders’ currency contract orders to a “head dealer” at Noble Wealth HK, who then attempted to match customer buy and sell orders every half hour. Baragosh claimed that if there were unmatched orders, Noble Wealth HK would purchase off-setting currency -positions on the interbank market through a firm called Bull & Bears, which was supposedly located in London.
 

 24. Thus, by Baragosh’s own admission, Noble Wealth’s traders were not entering into transactions on the interbank
 
 *683
 
 market; instead, their trades were being “bucketed” or matched by Noble Wealth HK.
 

 25. A comparison of Noble Wealth’s bank records and customer account statements establishes that Noble Wealth purchased few, if any, foreign currency contracts on behalf of its customers, and that not one of Noble Wealth’s transfers of funds to Noble Wealth HK corresponded to customers’ purported purchases and sales of currency contracts.
 

 26. Instead, Noble Wealth and Bara-gosh diverted customer funds, using them-to pay for operating expenses, personal expenses, salaries, commissions, and other expenses.
 

 27. Substantial portions of customer funds were also wired to Noble Wealth HK and Bull & Bears, never to be returned to customers.
 

 28. Noble Wealth’s entire premise was misleading. The nature of the interbank market is such that it was impossible for Noble Wealth to provide its traders with the ability to place trades on the interbank market.
 

 29. Expert Maher testified at the preliminary injunction hearing that the interbank market consists of the trading of foreign currency contracts between investment banks and other large institutional investors. For several reasons, individual investors are generally foreclosed from participating in that market. One reason is that the market has considerable capital requirements for its participants. Second, interbank market participants have prearranged counter-party credit lines due to the considerable exposure to default on foreign currency contracts. Third, since settlement of the contracts occurs in the country where the currency is issued, interbank market participants must maintain bank accounts in each country in which each traded currency is issued — for instance, in Japan for Yen. Fourth, a transaction on the interbank market is generally in the millions of dollars, with five million dollars considered a small foreign exchange deal. A $100,000 transaction — the size of Noble Wealth’s purported currency contracts — is virtually unheard of. Finally, interbank market currency contracts typically are not purchased on margin. In a word, the interbank market is generally unavailable to small investors such as Noble Wealth’s customers.
 

 C.
 
 Baragosh’s Role
 

 30. Esfahand Baragosh managed and actively participated in the day-to-day activities of Noble Wealth’s Maryland and Georgia offices, placed advertisements for new traders, conducted initial interviews of these prospects, and oversaw their training at both locations.
 

 31.
 
 During the training sessions, Bara-gosh represented to trainees that he was an extremely successful currency trader who had become a millionaire trading foreign currencies.
 

 32. During these sessions, Baragosh referred trainees to the extraordinary profit projections contained in Noble Wealth’s brochures and touted the company’s reputation.
 

 33. Baragosh also encouraged the trainees to solicit their friends and families to open $10,000 trading accounts.
 

 34. Baragosh conducted weekly meetings in Noble Wealth’s offices in which he encouraged traders to place more trades.
 

 35. Baragosh received a personal commission of two dollars per trade executed by all Noble Wealth traders.
 

 36. Baragosh also controlled Noble Wealth’s finances, had signature authority over the bank accounts for Noble Wealth’s Maryland and Georgia offices, endorsed checks and wrote checks on these accounts.
 

 37. Baragosh expressly held himself out to the public as a controlling person of Noble Wealth. At a private arbitration hearing on April 7, 1998, for instance, Bar-agosh identified himself as the vice-presi
 
 *684
 
 dent of Noble Wealth and testified on behalf of Noble Wealth.
 

 38. During that arbitration hearing, Baragosh also testified that he oversaw the day-to-day operations at the Maryland and Georgia offices.
 

 39. At all relevant times, Baragosh knew that the majority, if not all, of Noble Wealth customers were losing money. Noble Wealth’s 1099 tax forms for 1996 were located in Baragosh’s office in Maryland and reflected that every one of the Noble Wealth traders had lost money for the year.
 

 40. Since Baragosh signed the checks when customers wanted to withdraw their money from their accounts, he was well aware that customers had liquidated their accounts for far less than they initially invested.
 

 41. Despite knowing that Noble Wealth traders and clients were losing money, Baragosh continued to solicit new trainees for the Noble Wealth’s trading operation and continued to represent that traders could earn substantial profits trading through Noble Wealth.
 

 D.
 
 Role of Currex and IAI
 

 42. In June of 1998, customers of Noble Wealth’s Georgia office received notices informing them that Noble Wealth was merging with Currex and that Currex would offer the same services as Noble Wealth.
 

 43. Baragosh testified at the preliminary injunction hearing that Currex took over all of the customers of Noble Wealth’s Georgia office and that Currex continued operations at the same physical location as Noble Wealth’s Georgia office.
 

 44. The same “traders” who had worked for Noble Wealth’s Georgia office became Currex workers. Documents found on the Currex premises in Georgia included Currex brochures describing how to place customer orders with Noble Wealth. Identical memoranda describing the commission structure and rates for “traders” were found on both the Currex premises in Georgia and the Noble Wealth premises in Maryland.
 

 45. Baragosh was a controlling person of Currex. He was a vice president of Currex and continued to conduct training for Currex “traders” just as he had for Noble Wealth. He had signature authority over Currex’s bank accounts and wrote checks on those accounts, including Currex checks written to satisfy an arbitration award entered against Noble Wealth.
 

 46. Shortly before this suit was filed, Noble Wealth’s Maryland office changed its name to IAI and relocated its office, and Baragosh signed a new lease for the company under the IAI name.
 

 47. Baragosh set up the IAI office using funds- from Noble Wealth. Under the IAI name, newspaper advertisements were taken out for currency “traders.” These advertisements were identical to those that had been placed by Noble Wealth.
 

 48. IAI continued operations substantially identical to those of Noble Wealth.
 

 49. Baragosh was a controlling person of IAI. He was its vice president, signed the lease for its office, had signatory authority on its bank account and was the sole person who wrote checks on the account.
 

 III.
 

 Summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that they moving party is also entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c);
 
 see also Celotex Corp. v. Catrett,
 
 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). “[T]he burden on the moving party may be discharged by a ‘showing’ — that is pointing out to the district court — that
 
 *685
 
 there is an absence of evidence to support the nonmoving party’s case.”
 
 Motor Club of America Ins. Co. v. Hanifi,
 
 145 F.3d 170, 174 (4th Cir.),
 
 cert. denied,
 
 525 U.S. 1001, 119 S.Ct. 509,142 L.Ed.2d 423 (1998) (quoting
 
 Anderson,
 
 477 U.S. at 249-50, 106 S.Ct. 2505).
 

 Once the moving party has met this burden, the burden of production shifts to the nonmoving party who “must do more than simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita Electronic Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted). The nonmoving party “may not rest upon the mere allegations or denials of the adverse party’s pleading,” Fed. R.Civ.P. 56(e), but must come forward with “specific facts showing that there is a genuine issue for trial.”
 
 Matsushita,
 
 475 U.S. at 587, 106 S.Ct. 1348. “Mere unsupported speculation ... is not enough to defeat a summary judgment motion.”
 
 Ennis v. Nat’l Assn. of Bus. & Educ. Radio, Inc.,
 
 53 F.3d 55, 62 (4th Cir.1995).
 
 See also Runnebaum v. NationsBank of Maryland, N.A,
 
 123 F.3d 156, 163 (4th Cir. 1997) (overruled on other grounds) (“mere existence of a scintilla of evidence” in support of the nonmoving party’s position is insufficient to defeat a motion for summary judgment (quoting
 
 Anderson,
 
 477 U.S. at 252, 106 S.Ct. 2505)). Courts must be especially cautious in granting summary judgment when questions of intent are presented but such issues do not preclude the entry of summary judgment.
 
 Bradford v. School District No. 20,
 
 364 F.2d 185, 187 (4th Cir.1966).
 

 The record reveals no genuine dispute as to any material fact in this case. As the Court now explains, the Commission is entitled to judgment as a matter of law against Baragosh for misappropriation of customer funds and fraud (Count I), bucketing of customer orders (Count II), and the offer and sale of illegal futures contracts (Count III).
 

 IV.
 

 A.
 
 Jurisdiction
 

 The Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, which authorizes the Commission to seek injunc-tive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order promulgated thereunder.
 

 Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-l(e), because at all relevant times, Noble Wealth, its successor entities, and Baragosh were found in, inhabited or transacted business in the District of Maryland. The acts and practices alleged to have violated the Act occurred within this district, among other places.
 

 B.
 
 Noble Wealth and Baragosh Engaged in Fraud in Violation of Section Ib(a)(i)-(iii) of the Act
 

 Violation of the anti-fraud provisions of the Act occurs when (1) an entity or person makes misrepresentations or deceptive omissions (2) with scienter and (3) the misrepresentations are material.
 
 CFTC v. Commonwealth Fin. Group, Inc.,
 
 874 F.Supp. 1345, 1354-55 (S.D.Fla.1994).
 
 See also CFTC v. Noble Metals Int’l, Inc.,
 
 67 F.3d 766, 774 (9th Cir.1995) (scienter is an element needed to establish a violation of Section 4b).
 

 The record in this case demonstrates that Noble Wealth and Baragosh engaged in fraud as defined in the Act.
 

 Without question they misrepresented the profits and risks associated with Noble Wealth’s foreign exchange currency contracts, falsely characterized the experience of Noble Wealth’s traders, issued false account statements and misappropriated customer funds.
 

 
 *686
 
 Noble Wealth and Baragosh acted with scienter. This element may be established in two ways: (1) by demonstrating that a defendant knew his representations were false and calculated to cause harm; or (2) by showing that he made the representations with a reckless disregard for their truth or falsity.
 
 Noble Metals, 67
 
 F.3d at 774.
 
 See also Crothers v. CFTC,
 
 33 F.3d 405, 411 (4th Cir.1994) (“recklessness is sufficient to satisfy Section 4b’s scienter requirement”) (quoting
 
 Drexel Burnham, Lambert v. CFTC,
 
 850 F.2d 742, 748 (D.C.Cir.1988));
 
 Messer v. E.F. Hutton & Co.,
 
 847 F.2d 673, 677-79 (11th Cir.1988) (discussing scienter requirement of Section 4o of the Act, 7 U.S.C. § 6o);
 
 Drexel,
 
 850 F.2d at 748 (reckless inattention to obvious dangers to a client’s interests in arranging a purchase or sale of commodities triggers liability under Section 4b).
 

 The uncontested record establishes that Noble Wealth and Baragosh knew that their profit and risk claims were false, knew that they were misrepresenting the qualifications of their traders, knew that the account statements issued to customers and traders falsely represented that Noble Wealth was purchasing foreign currency contracts, and knew that they were engaging in misappropriation of funds. Despite this knowledge, Noble Wealth and Baragosh continued to recruit traders and customers, urging them to invest in Noble Wealth’s foreign exchange currency contracts and continued to claim that they could earn substantial profits. Noble Wealth and Baragosh also urged existing customers to send additional funds to Noble Wealth when the market purportedly moved against their positions, even though Noble Wealth and Baragosh knew no foreign currency contracts were being purchased. Noble Wealth and Baragosh’s actions were reckless and involved “highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care.”
 
 Messer,
 
 847 F.2d at 678.
 

 The final element for establishing fraud under Section 4b(a) of the Act, also clearly met in this case, is that the knowing misrepresentations must have been material. A statement or omitted fact is material if “it is substantially likely that a reasonable investor would consider the matter important in making an investment decision.”
 
 Sudol v. Shearson Loeb Rhoades, Inc.,
 
 [1984-1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,748 at 31,119 (CFTC Sept. 30, 1985) (citing
 
 TSC Indus., Inc. v. Northway, Inc.,
 
 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). False representations regarding profit potential and risk are considered material. ‘When the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers.”
 
 In re JCC Corp.,
 
 [1994-1996 Transfer Binder] Comm.Fut.L.Rep. (CCH) 1126,080 at 41,576 n. 23 (CFTC May 12, 1994). Indeed, misrepresentations concerning profit and risk go to the heart of a customer’s investment decision and are therefore material as a matter of law.
 
 See Commonwealth,
 
 874 F.Supp. at 1353 (combined with claims that risks are subject to specific limitations, profit claims amount to guarantees of profitability prohibited by Section 4b);
 
 Hall v. Paine Webber Jackson & Curtis, Inc.
 
 [1986-1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,317 at 32,890 (CFTC Oct. 8, 1986) (when broker emphasized limited risk and explained rationale for expected profits, it was reasonable for customer to interpret a prediction of a specific and substantial level of profits as a guarantee of some profit); and
 
 Keller v. First Nat’l Monetary Corp.,
 
 [1984-1986 Transfer Binder] Comm. FutL.Rep. (CCH) 1122,402 at 29,823 (CFTC Oct. 22, 1984) (“As we have held in other cases, statements that lead a customer to believe that a particular investment is virtually risk-free and will almost cer
 
 *687
 
 tainly yield a profit are not protected from claims of fraud simply because the broker has made a
 
 pro forma
 
 disclosure of risk”).
 

 False representations of account activity as reflected in customer account statements are also material because a customer’s understanding of whether he or she is making a profit on an investment will almost certainly influence the decision as to whether to invest additional funds.
 
 See Sudol,
 
 [1984-1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) at 31,119 (citing
 
 TSC Indus., Inc.,
 
 426 U.S. at 449, 96 S.Ct. 2126).
 

 In addition, false representations regarding a broker’s expertise are material.
 
 Commonwealth,
 
 874 F.Supp. at 1353-54 (misrepresentations regarding the trading record and experience of broker are fraudulent because past success and experience are material factors to reasonable investors);
 
 Jakobsen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 
 [1984-1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,812 at 31,392 (CFTC Nov. 21, 1985) (broker’s prior trading experience is a significant and material factor in investment decision-making process).
 

 Finally, misappropriation of funds constitutes “willful and blatant” fraudulent activity violative of Section 4b(a) of the Act.
 
 CFTC v. Cheung,
 
 No. CIV. 5598(RPP), 1994 WL 583169, at *1-2 (S.D.N.Y. Oct.21, 1994) (preliminary injunction granted against defendant who solicited customers to trade in commodities and then embezzled and converted customer funds);
 
 CFTC v. Clothier,
 
 788 F.Supp. 490, 492 (D.Kan.1992) (a violation of Section 4o of the Act includes the fraudulent misappropriation of customers’ funds entrusted to broker for trading purposes);
 
 CFTC v. Skorupskas,
 
 605 F.Supp. 923, 932 (E.D.Mich.1985) (defendants defrauded customers by soliciting investor funds for trading and then not trading those funds);
 
 In re Lincolnwood Commodities, Inc.,
 
 [1982-1984 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 21,986 at 28,255 (1984) (Commission affirmed holding that defendant violated Section 4b when he “diverted to his own use funds entrusted to him by or on behalf of his customers”);
 
 CFTC v. Muller,
 
 570 F.2d 1296, 1300-01 (5th Cir. 1978) (preliminary injunction affirmed where CFTC made a prima facie showing that defendant had misappropriated customer funds in violation of the Act).
 

 The record is pellucidly clear that Noble Wealth and Baragosh’s claims regarding profit potential and risks, customer account activity, and the expertise of their personnel were material. That they misappropriated customer funds is equally apparent. All these actions were fraudulent, wilfully and blatantly so, within the meaning of Section 4b(a)(I) — (iii), 7 U.S.C. § 6b(a)(I) — (iii).
 

 C.
 
 Noble Wealth Engaged in Bucketing of Customer Orders in Violation of Section ib(a)(iv) of the Act
 

 “Bucketing” occurs when “orders of customers for the purchase or sale of commodities for future delivery, instead of being executed by bonafide purchases and sales with other traders, are simply matched and offset in the soliciting firm’s own office and the firm itself takes the opposite side of customers’ orders.”
 
 Purdy v. CFTC,
 
 968 F.2d 510, 520 (5th Cir. 1992) (quoting 80 Cong.Rec. 8,088 (May 27, 1936) (remarks of Senator Pope));
 
 see also CFTC v. Standard Forex, Inc.,
 
 1996 WL 435440 at *9 n. 9 (E.D.N.Y. July 25, 1996) (bucketing occurs when a trading company takes the opposite half of a customer’s position rather than putting the trade through to a neutral market).
 

 Baragosh has admitted that Noble Wealth’s trader and customer orders were not competitively executed on a neutral market. The uncontested record demonstrates that Noble Wealth and Baragosh did not place customer trades on the interbank market, but instead had Noble Wealth HK match customer orders with offsetting currency positions. The record
 
 *688
 
 shows indisputably that Noble Wealth and Baragosh acted with scienter.
 

 Accordingly, Noble Wealth and Bara-gosh engaged in bucketing in violation of Section 4b(a)(iv) of the Act.
 

 D.
 
 Noble Wealth and Baragosh Violated Section k(a) of the Act by Selling Illegal Futures Contracts
 

 Section 4(a) of the Act, 7 U.S.C. § 6(a), requires that “futures contracts” be sold on a “contract market” designated by the Commission. While the term “futures contact” is not defined in the Act and there is no established list of the elements of a futures contract,
 
 CFTC v. Co Petro Mktg. Group, Inc.,
 
 680 F.2d 573, 577, 581 (9th Cir.1982), cases have fleshed out its meaning. Thus, a “futures contracts” has been defined as a contract for the purchase or sale of a commodity for delivery in the future at a price established at the time the contract is initiated. It may be fulfilled through offset, cancellation, cash settlement, or other means to avoid delivery, and is entered into primarily to hedge or speculate upon price changes in the commodity without transferring ownership of the commodity.
 
 See Noble Metals,
 
 67 F.3d at 766 (holding that defendants sold futures contracts where customers had no expectation of taking delivery);
 
 Co Petro,
 
 680 F.2d at 578-81 (holding that defendants sold futures where customers were speculators from the general public, entering into standardized contracts to facilitate offset with no intention of taking delivery);
 
 CFTC v. Hanover Trading Corp.,
 
 34 F.Supp.2d. 203, 206 (S.D.N.Y.1999) (holding that defendants telemarketed futures contracts where customers entered into contracts with no expectation or intention of taking delivery, but instead to assume risk of price changes). Other characteristics that facilitate exchange-traded contracts include standardized commodity units and initial deposit and maintenance margin requirements.
 
 In re First Nat’l Monetary Corp.,
 
 [1984-1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,698 at 30,975-76 (CFTC Aug. 7,1985).
 

 The “contract market” on which futures contracts must be sold refers to Commission-designated boards of trade,
 
 Noble Metals,
 
 67 F.3d at 772 (futures contracts not sold thus deemed illegal “off exchange” contracts).
 

 Noble Wealth’s contracts manifestly exhibited the characteristics of contracts found by other courts to be futures contracts. The foreign currency contracts it sold to traders and customers were contracts for the purchase or sale of currencies for delivery in the future. The price of the currencies was set at the time the contract was initiated. The value of the contracts rose and fell with subsequent rises and falls in the value of the underlying foreign currencies, thus offering customers the ability to speculate on fluctuations in the value of the Japanese Yen, the German Deutschemark, the Swiss Franc, and other foreign currencies. Individuals who entered into these contracts were able to capture these price movements and avoid making or taking delivery of foreign currencies by offsetting the contracts. The Noble Wealth contracts had standardized commodity unit and investors could purchase the contracts on leverage through an initial deposit. Investors were then required to invest additional funds (“maintenance margin”) if the market moved against their positions. The futures contracts, however, were sold not from designated contract markets, but from Noble Wealth’s Maryland and Georgia offices. Since under Section 4(a) of the Act, futures contracts must be sold on an exchange designated by the Commission, Noble Wealth violated that provision of the Act.
 

 E.
 
 Noble Wealth’s Contracts are Not Spot Contracts
 

 Lest there be any doubt, Noble Wealth’s contracts were not spot contracts exempt from regulation by the Commis
 
 *689
 
 sion. “Spot contracts,” which are not futures contracts, are agreements for the purchase and sale of commodities that anticipate near-term delivery.
 
 Dunn v. CFTC,
 
 519 U.S. 465, 472, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997);
 
 see also Salomon Forex, Inc. v. Tauber,
 
 8 F.3d 966, 970 (4th Cir.1993),
 
 cert. denied,
 
 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994) (spot transactions are transactions for the immediate sale and delivery of a commodity). “The ‘spot market’ is essentially the current market, as distinguished from the futures market.”
 
 Bank Brussels Lambert, S.A. v. Intermetals Corp.,
 
 779 F.Supp. 741, 742 (S.D.N.Y.1991). Spot transactions in foreign currencies call for settlement within two days.
 
 Id.
 
 Spot contracts are excluded from regulation under the Act because Congress felt that “[tjransactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented.”
 
 Salomon Forex, Inc. v. Tauber,
 
 8 F.3d at 970 (4th Cir. 1993),
 
 cert. denied,
 
 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). Congress, however, never intended to exclude from the Commission’s jurisdiction transactions which are “sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future.”
 
 Co Petro,
 
 680 F.2d at 579 (citation omitted);
 
 Noble,
 
 67 F.3d at 772
 
 citing Co Petro,
 
 680 F.2d at 579.
 

 Noble Wealth’s contracts were not spot contracts. Noble Wealth investors had no need for foreign currency and never actually took delivery of the currency. Contracts were sold for speculative purposes and were not predicated on the actual delivery of the currency. Spot transactions in foreign currencies call for settlement within two days whereas Noble Wealth’s contracts were held open indefinitely. Expert Maher testified at the preliminary injunction hearing that spot transactions are conducted on the interbank market and that transactions are for millions of dollars, with five million dollars being a small transaction. Maher also testified that spot transactions in the foreign exchange currency market are conducted with a counter-party, such as a bank, based on pre-arranged lines of approval. The small size of Noble Wealth’s contracts ($100,000) and the lack of counter-party lines of credit and foreign bank settlement accounts indicate that no interbank market transactions were taking place. Baragosh conceded in his arbitration testimony that Noble Wealth HK matched buy and sell orders and thus did not engage in interbank market transactions. The Court finds that the Noble Wealth contracts do not fall within the spot contract exception to the Commission’s jurisdiction.
 

 F.
 
 Noble Wealth’s Contracts Were Offered and Sold on a “Board of Trade” and Thus Fall Within the Commission’s Jurisdiction
 

 The “Treasury Amendment,” 7 U.S.C. § 2(a)(ii), excludes from the Commission’s jurisdiction futures and option transactions involving foreign currencies and certain other designated financial instruments not conducted on a “board of trade.” Section la(l) of the Act defines a “board of trade” as “any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity or receiving the same for sale or consignment.” 7 U.S.C. § la(l). A number of courts and the Commission have found that, where a defendant engages in mass marketing to small unsophisticated investors, it operates a “board of trade” within the Commission’s jurisdiction.
 

 In
 
 Salomon Forex,
 
 the U.S. Court of Appeals for the Fourth Circuit observed that only individually-negotiated foreign currency option and futures transactions between sophisticated large-scale foreign currency traders fall within the Treasury Amendment’s exclusion, not transactions
 
 *690
 
 by “unsophisticated private individuals” buying on an organized but unregistered exchange.
 
 Salomon Forex, 8
 
 F.Bd at 977-78. Though the court held that the transactions in that case were exempt from Commission jurisdiction because the defendant was in fact a “sophisticated trader” who conducted extensive trading worth billions of dollars, owned a trading company, and was not trading on an “unregulated exchange,” it specifically noted that “[t]his case does not involve mass marketing to small investors, which would appear to require trading through an exchange, and our holding in no way implies that such marketing is exempt from the [Act].”
 
 Id.See also Rosner v. Peregrine Finance Ltd.,
 
 1998 WL 249197 at *1, *3-5 (S.D.N.Y. May 18, 1998) (foreign currency transactions occurred on a “board of trade” because they “were not interbank transactions and not subject to government regulation other than under the [Act]”);
 
 CFTC v. Am. Bd. of Trade, Inc.,
 
 803 F.2d 1242 (2d Cir.1986) (holding that while the Treasury Amendment excluded from the Commission’s jurisdiction foreign currency transactions between “sophisticated financial institutions,” it did not exclude the defendant’s operation of a foreign currency exchange marketing to and engaging in transactions with private individuals).
 

 In
 
 CFTC v. Standard Forex, Inc.,
 
 1993 WL 809966 at *1 (E.D.N.Y. Aug.9, 1993), the district court held that a board of trade exists where “private unsophisticated investors are transactional participants.”
 
 Id.
 
 at *1. Defendants operated an office in New York for purposes of engaging in investing and trading activities concerning foreign currencies.
 
 Id.
 
 at *2. “Account executives” who had no prior trading experience were recruited and hired, it appeared, “simply because they had money or had friends and family who were likely to have the funds to invest -with Standard Forex.”
 
 Id.
 
 at *3. In training the account executives, defendants provided sales scripts containing assurances about the profitability of trading with the firm.
 
 Id.
 
 Foreign currency contracts were marketed to members of the general public.
 
 Id.
 
 While these contracts were portrayed as “spot” contracts, they were standardized, leveraged contracts that required margin and could be offset.
 
 Id.
 
 at *4. They had no deadline for performance; customers never intended to, nor did they, make or accept delivery; and customers were informed and anticipated that they would profit from the fluctuation in the prices of foreign currencies.
 
 Id.
 
 Customers almost uniformly lost money.
 
 Id.
 
 at *5.
 

 The Commission itself has held that foreign currency bucket shops are “boards of trade” subject to Commission jurisdiction. In
 
 In re Global Link Miami
 
 Corp, (CFTC June 22, 1999), it held that the term “board of trade” is used “to distinguish between the interbank market of sophisticated financial institutions executing bilaterally-negotiated currency contracts and the public markets or exchanges trading currency futures and options.”
 
 Id.
 
 at *11. Because the Global Link facility was clearly a “public” one, it was deemed a board of trade.
 
 Id.
 
 at *12. Defendant there, as Noble Wealth here, advertised for “account executives” by placing advertisements in newspapers, and these account executives in turn solicited customer accounts from friends and the public at large, as well as trading for themselves.
 
 Id.
 
 Investors only needed to provide small amounts of money to open and maintain an account with Global Link and had no commercial purpose for trading.
 
 Id.
 

 In the present case, Noble Wealth engaged in “mass marketing to small investors” by providing a foreign currency trading facility that allowed them, with a minimum deposit, to become “traders” at its board of trade. Noble Wealth recruited traders who had no prior trading experience and urged them to invest their own funds as well as to solicit their friends and families to invest with Noble Wealth. Noble Wealth provided traders with brochures and telephone scripts for use in
 
 *691
 
 soliciting potential customers. It also provided the mechanism for traders to get prices, make orders, execute orders and offset those orders with matching opposite transactions. It further confirmed, both orally and in writing, that the traders’ orders had been made. Noble Wealth’s orders were standardized, leveraged contracts of its own devise and were marketed to the general public. The contracts could be held open indefinitely. They were closed out by entering into an offsetting transaction rather than by taking delivery. These features bring Noble Wealth’s activities squarely within the Act’s statutory definition of the term “board of trade,” consequently within the jurisdiction of the Commission.
 

 G.
 
 Noble Wealth, Currex, and IAI Operated as a Common Enterprise and Are Thus Jointly and Severally Liable for Violations of the Act
 

 When determining whether a common enterprise exists,
 

 courts look to a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a “maze of interrelated companies,” the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which “reveals that no real distinction existed between the Corporate Defendants.”
 

 FTC v. Wolf,
 
 1996 WL 812940, *7 (S.D.Fla. Jan.31,1996) (citations omitted).
 

 Currex and IAI constituted a common enterprise with Noble Wealth. Both were formed as successors to Noble Wealth, both were funded through Noble Wealth, and both were operated by the same individuals who operated Noble Wealth. Currex and IAI used the same “traders,” advertising, and marketing materials to tout the same trading scheme as Noble Wealth.
 

 As a common enterprise, Noble Wealth, IAI and Currex are jointly and severally liable for the injuries caused by their actions.
 
 Id.
 
 at *8. They are thus jointly and severally liable for Noble Wealth’s violations of the Act.
 

 H.
 
 Baragosh is Liable as a, Controlling Person
 

 Section 13b of the Act provides that individuals are liable as “controlling persons” if they:
 

 directly or indirectly, control[ ] any person who has violated [the Act or CFTC Rules], In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.
 

 7 U.S.C. § 13c(B);
 
 CFTC v. Sidoti,
 
 178 F.3d 1132, 1136 (11th Cir.1999). To be liable as a controlling person, an individual must possess general control over the operation of the entity principally liable and either (1) knowingly induce, directly or indirectly, the acts constituting the violations or (2) fail to act in good faith.
 
 In re Apache Trading Corp.,
 
 [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (OCH) 1125,251 at 38,794 (CFTC Mar. 11, 1992). An individual has the requisite degree of control when he or she has “the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.”
 
 In re Spiegel,
 
 [1987-1990 Transfer Binder] Comm. FutL.Rep. (CCH) ¶ 25,399 at 34,765 n. 4 (CFTC Jan. 12, 1988). Merely possessing the authority to direct policy suffices to meet the standard; a controlling person need actually not exercise that authority to be found liable under Section 13(b).
 
 Id.; see also Monieson v. CFTC,
 
 996 F.2d 852, 860 (7th Cir.1993) (“We emphasize that it is Lthe defendant’s] power that matters, not whether he exercised it by actually participating in or benefitting from the illegal acts”).
 

 
 *692
 
 Against this backdrop, the Court finds Baragosh was a controlling person of Noble Wealth, Currex, and IAI.
 

 By his own admission, Baragosh was the vice president of Noble Wealth, Currex and IAI, and managed the day-to-day activities of offices of all three entities. He conducted training sessions and signed checks drawn on Noble Wealth’s and Cur-rex’s bank accounts. He appeared on behalf of Noble Wealth at an arbitration hearing. He leased office space for Noble Wealth, Currex and IAI and placed advertisements in newspapers seeking new traders.
 

 Baragosh also knowingly induced violations of the Act by Noble Wealth, Currex and IAI, because he had actual or constructive knowledge of the core activities constituting the violations at issue and allowing them to continue.
 
 Spiegel,
 
 [1987-1990 Transfer Binder] Comm.FutL.Rep. (CCH) at 34,767;
 
 Noble Metals,
 
 67 F.3d at 774;
 
 CFTC v. Commonwealth Fin. Group,
 
 874 F.Supp. 1345, 1354-55 (S.D.Fla.1994). Constructive knowledge may be found when an individual was actively involved in the sales solicitation process.
 
 In re JCC Corp.,
 
 [1994-1996 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 26,080 at 41,576 (CFTC May 12,1994).
 

 Baragosh provided training to Noble Wealth and Currex’s traders, distributed fraudulent solicitation materials, encouraged traders to invest money, and made claims regarding the profitability of trading with Noble Wealth and Currex. He did this knowing all along that customers were losing money, evidenced, among other things, by the 1099 forms found in his office which reflected that not a single Noble Wealth. trader had made money.
 

 Baragosh is hable as a controlling person of Noble Wealth, Currex and IAI.
 

 .V.
 

 The Commission seeks a permanent injunction that would prohibit Baragosh from violating the Act or from soliciting customers or customer funds. It also seeks restitution for injured investors, disgorgement of unlawfully obtained benefits, the imposition of a civil penalty, and pre- and post-judgment interest.
 

 A. Section 6e(a) of the Act, 7 U.S.C. § 13a-l authorizes the Court to enjoin any violation of the Act. Injunctions are granted upon a “showing that illegal activity has occurred and that there is a reasonable likelihood that the wrong will be repeated.”
 
 Kelley v. Carr,
 
 442 F.Supp. 346, 355 (W.D.Mich.1977),
 
 aff'd in rel. part, rev’d in part,
 
 691 F.2d 800 (6th Cir.1980). Once past unlawful conduct is established, the law presumes a likelihood of future violations absent proof to the contrary.
 
 Am.Bd. of Trade, Inc.,
 
 803 F.2d at 1251;
 
 see also CFTC v. Hunt,
 
 591 F.2d 1211, 1220 (7th Cir.1979). Baragosh has played an integral role in the trading operations of Noble Wealth, Currex, and IAI and their claims of high profits and limited risks. He personally led traders to expect high profits and limited risk, knowing full well that all of Noble Wealth’s customers had in fact lost money. He also knew that Noble Wealth’s trading operation did not provide customers with access to the interbank market, leading them instead to a traders’ bucket shop where orders were simply matched and where the customers’ substantial payments summarily disappeared. The pervasiveness and seriousness of Baragosh’s violations justify the issuance of a permanent injunction prohibiting him from violating the Act and from engaging in any commodity-related activity, including soliciting customers and funds.
 

 B. Although § 6(c), 7 U.S.C. § 13a-l, speaks only in terms of actions to enjoin or restrain violations of the Act, ancillary relief has also been deemed available under that section.
 
 See e.g. Co Petro Marketing,
 
 680 F.2d at 582-83. Such relief may consist of restitution,
 
 i.e.
 
 “restoring the status quo and ordering the return of that which rightfully belongs to the purchaser,”
 
 Porter v. Warner Holding Co.,
 
 328 U.S. 395,
 
 *693
 
 402, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), as well as disgorgement of profits earned by the wrongdoer,
 
 Co Petro Marketing,
 
 680 F.2d at 583-4;
 
 see also SEC v. Commonwealth Chem. Sec. Inc.,
 
 574 F.2d 90, 102 (2d Cir.1978) (Friendly, J.) (“The primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up an amount by which he was unjustly enriched.”) In this case, the Commission seeks both restitution and disgorgement.
 

 1. Restitution is measured by the amount invested by customers less any refunds made by the defendants.
 
 See FTCv. Wolf,
 
 1996 WL 812940, *9 (S.D.Fla. 1996).
 
 See also FTC v. Nat’l Business Consultants, Inc.,
 
 781 F.Supp. 1136, 1143 (E.D.La.1991) (“Generally, the amount of restitution in FTC consumer redress cases is the purchase price of the relevant product or business opportunity, less any refunds or money earned”);
 
 see also FTC v. Wilcox,
 
 926 F.Supp. 1091, 1105 (S.D.Fla. 1995) (Restitution awarded through summary judgment where defendants failed to produce credible evidence rebutting FTC’s showing; award calculated from gross income reflected on defendants’ tax returns less cost of goods actually forwarded to consumers.) Since Noble Wealth and Currex customers invested $6,490,969 and received $1,226,718 in return from Noble Wealth and Currex, they sustained a net loss of $5,264,251, the amount the Commission seeks in restitution.
 

 2. As for disgorgement, the Commission asks for “a reasonable approximation of profits causally connected to the violation,”
 
 SEC v. First City Fin. Corp.,
 
 890 F.2d 1215, 1230 (D.C.Cir.1989), and would have the Court order Baragosh to return the salary and commissions he received from Noble Wealth and Currex,
 
 viz.
 
 $403,-686.
 

 3. These two types of equitable relief — restitution and disgorgement — are not necessarily inconsistent and in an appropriate case wronged investors may be able to obtain both their money back plus any of the wrongdoer’s ill-gotten profits.
 
 See e.g.
 
 Restatement of Restitution, §§ 151, 157 (1988); Dan B. Dobbs, Law of Remedies, § 4.5(5). The problem in the present case, however, is that the Commission calculates the disgorgement due from Baragosh on the basis of the salary and commissions he received, not in terms of profits either he or his companies earned using investors’ funds. Yet from all that appears, the salaries and commissions Bar-agosh received were taken out of the funds that the investors paid in, as opposed to being drawn from additional profits Bara-gosh or his companies may have earned based on their own use of those paid-in funds. To the extent this is so, the Commission is asking that the salaries and commissions paid to Baragosh be counted twice, first as part of the restitution award, then again as part of the disgorgement award. That, in the Court’s view, is inappropriate. As Professor Dobbs points out:
 

 The familiar principle of
 
 damages
 
 law is that the remedy should not provide more than one full compensation. The analogous principle of
 
 restitution
 
 law is that restitution should not force disgorgement of more than the unjust enrichment. If the two remedies are to be combined in one recovery, those limiting principles require that the combined recovery must not exceed the greater of (a) full compensation or (b) full disgorgement. If the combination does not exceed full compensation, or full disgorgement of the unjust enrichment, then it should be permitted.
 

 Dobbs,
 
 § 4.5(b).
 

 4. The Court concludes, given the state of the proof, that the Commission is entitled to an order of restitution in the amount of $5,264,251, but not an additional disgorgement award of $403,686. The Court’s Order will reflect that distinction.
 
 [3]
 

 
 *694
 
 C. That said, the $403,686 figure does not disappear from the case altogether. In fact, it .comes back into play on the matter of a possible fine. Thus, pursuant to § 6(c)(d)(l) of the Act, 7 U.S.C. § 13a-1(d)(1), “the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation a civil penalty in the amount of not more than the higher of $100,000 or tripie
 
 the monetary gain to the person for each violation.”
 
 (Emphasis added).
 

 This portion of the statute clearly permits an assessment above and beyond any restitution award and does so for at least two reasons. First, the assessment represents a fine imposed by the regulatory agency to punish a wrongdoer, a sum which redounds not to the benefit of the investors (as does the restitution award) but to the U.S. Government. Second, the statutory language establishes as the measure of the fine a multiple of the
 
 “monetary gain
 
 ” to the person. The term is not identical to “illegal profits” associated with disgorgement and certainly comprehends an individual’s salary and commissions. The Court, therefore, will take the sum of Baragosh’s salary and commissions— $403,686 — as the basis for its calculation of afine.
 

 In determining how extensive the fine for violations of the Act ought to be, courts and the Commission have focused upon the nature of the violations. “The general seriousness of a violation derives primarily from its relationship to the various regulatory purposes of the [Act]. Conduct that violates core provisions of the Act’s regulatory system — such as manipulating prices or defrauding customers should be considered very serious.”
 
 JCC, Inc. v. CFTC,
 
 63 F.3d 1557, 1571 (11th Cir.1995) (quoting
 
 In re Premex,
 
 [1987-1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,165 at 34,-890-91 (CFTC Feb. 17, 1988)). In a recent case, the Commission reemphasized the need for sanctions to reflect both the severity of the violations and the need to deter future illegal conduct. “Customer fraud is a violation of the core provisions of the Act ... [w]here the losses or gains in a customer fraud case are substantial, so have been the civil penalties.”
 
 In re Slus-ser,
 
 (CFTC July 19,1999). In
 
 Slusser,
 
 the Commission also held that “[s]evere sanctions are warranted” when a defendant repeatedly violates the Act.
 
 Id.
 

 Baragosh engaged in repeated core violations of the Act over a period of several years and received direct benefit from Noble Wealth’s fraudulent operations despite the mounting losses of its customers. The serious nature of his violations demands a significant civil monetary penalty. By means of the sham futures market he ran, Baragosh received at least $403,686 in salary and commissions. That was his “monetary gain.” His conduct invites the severest sanction. Accordingly, he will be assessed a civil monetary penalty in the amount of $1,211,058 — triple his monetary gain — to be paid only after full satisfaction by him of the restitution award.
 
 [4]
 

 VI.
 

 A separate Order will be entered implementing this Opinion.
 

 ORDER
 

 Upon consideration of Plaintiff Commodity Futures Trading Commission’s Motion for Summary Judgment against Defendant Esfand Baragosh, it is for the reasons set forth in the accompanying Opinion, this 20 day of March, 2000
 

 ORDERED:
 

 1. Defendant Baragosh (and any person acting in the capacity of officer, servant, agent, employee, and attorney of Bar-agosh who receives actual notice of this
 
 *695
 
 Order by personal service or otherwise) is permanently enjoined from directly or indirectly:
 

 a. Violating Section 4b(a)(i) — (iii) of the Commodity Exchange Act, 7 U.S.C. § 6b (a) (i) — (iii), in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made or to be made, for or on behalf of any other person by (i) cheating or defrauding or attempting to cheat or defraud such other person; (ii) willfully making or causing to be made to such other person any false report or statement thereof, or willfully entering or causing to be entered for such person any false record thereof; or (iii) willfully deceiving or attempting to deceive such other person;
 

 b. Violating Section 4(a) of said Act, 7 U.S.C. § 6(a), by offering to enter into, entering into, executing, confirming the execution of, or conducting business for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery when: (a) such transactions have not been conducted on or subject to the rules of a board of trade which has been designated by the Commission as a “contract market” for such commodity; and (b) such contracts have not been executed or consummated by or through a member of such contract market; and
 

 c. Violating Section 4b(a)(iv) of said Act, in connection with orders to make, or the making of, contracts of sale for future delivery, made, or to be made, for or on behalf of other persons, bucketing such orders, or filling such orders by offset against the orders of other persons, or willfully and knowingly, without the prior consent of such persons, becoming the buyer in respect to the selling orders of such persons or becoming the seller in respect to the buying orders of such persons.
 

 2.
 
 Defendant Baragosh is permanently restrained and enjoined from:
 

 a. Acting in any capacity, including in an exempt capacity, as a futures commission merchant, commodity pool operator, commodity trading advisor, introducing broker, floor broker, floor trader, or associated person or other agent of any registrant as defined under said Act;
 

 b. Seeking application for registration with the Commission in any capacity at any time in the future;
 

 c. Soliciting or accepting any new customers or participants in connection with commodity futures or options trading, including but not limited to:
 

 i. Soliciting or accepting orders from others for the purchase or sale of commodity futures contracts or options on commodity futures contracts;
 

 ii. Soliciting or accepting money, securities, or property from others for the purpose of trading commodity futures contracts or options on commodity futures contracts;
 

 iii. Soliciting or accepting funds from others for instruction, direction or guidance including providing classes on futures or options, trading strategies, or disseminating information for compensation relating to commodity futures and options trading; and
 

 iv. Filing a petition in bankruptcy without providing this Court and the Commission with notice by certified mail of such filing.
 

 3. Judgment for restitution is ENTERED in favor of Plaintiff Commission and against Defendant Baragosh in the amount of $5,264,251 (Five Million Two Hundred Sixty-Four Thousand Two Hundred Fifty-One Dollars), plus pre- and post-judgment interest.
 

 4. A civil monetary penalty is ASSESSED and judgment thereon is ENTERED in favor of Plaintiff Commission and against Defendant Baragosh in the amount of $1,211,058 (One Million Two Hundred Eleven Thousand Fifty-Eight Dollars), plus post-judgment interest.
 

 
 *696
 
 5. Pre-judgment interest on the restitution award shall be calculated from October 1, 1998 through the date of this Order. Pre-judgment interest shall be paid at the then prevailing underpayment rate established quarterly by the Internal Revenue Service pursuant to 26 U.S.C. § 6621. Post-judgment interest shall be paid at the then prevailing Treasury Bill rate pursuant to 28 U.S.C. § 1961.
 

 6. The judgment on the civil monetary penalty shall be payable only upon full satisfaction of the judgment for restitution.
 

 7. The assets of Defendant Baragosh frozen pursuant to this Court’s October 1, 1998 statutory restraining order, as clarified on October 5, 1998, and this Court’s October 26, 1998 preliminary injunction shall be applied in partial satisfaction of the judgment for restitution provided by Paragraph 3 of this Order, and the possession of such funds shall be immediately transferred to the Receiver Ralph S. Tyler for distribution to customers of Noble Wealth and Currex.
 

 8. Within fifteen , (15) business days following the service of this Order, Defendant Baragosh shall, if he has not done so already:
 

 a. Provide the Commission with a full accounting of all of his assets and liabilities of by completing, signing, and serving on the Commission and the Receiver the “Financial Disclosure Statement” (CFTC form 177) attached to this Court’s October 1,1998 statutory retraining order;
 

 b. Provide the Commission with a full accounting of all funds, documents, and assets outside of the United States held by Defendant Baragosh or for his benefit, or under his direct or indirect control, whether jointly or singly; and
 

 c. Provide the Commission with access to all records of Defendant Baragosh held by financial institutions located outside the territorial United States.
 

 9. Except with leave of the Court, during the pendency of the Receiver’s duties as established by this Order and prior orders of the Court, Defendant Baragosh and all other persons and entities acting directly or indirectly on his behalf are enjoined from taking any action to establish or enforce any claim, right or interest for, against, on behalf of, in, or in the name of, Baragosh, the Receiver, Baragosh’s assets, or the Receiver’s duly authorized agents acting in their capacities as such, including but not limited to, the following:
 

 a. Commencing, prosecuting, litigating or enforcing any suit, except that actions may be filed to toll any applicable statue of limitations;
 

 b. Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, property of Defendant Baragosh or any property claimed by him, or attempting to foreclose, forfeit, alter or terminate any of his interests in property, whether such acts are part of a judicial proceeding or otherwise;
 

 c. Using self-help or executing or issuing, or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wherever located, owned by or in the possession of Defendant Baragosh, the Receiver, or any agent of the Receiver; and
 

 d. Doing any act or thing to in any way interfere with the Receiver or the Commission or the duties of the Receiver or the Commission; or interfering with the exclusive jurisdiction of this Court.
 

 This paragraph does not prohibit the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit’s police or regulatory power.
 

 10. The Receiver and all personnel hired by the Receiver as herein authorized, including counsel for the Receiver, are entitled to reasonable compensation for the
 
 *697
 
 performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the assets now held by, or in the possession or control of, or which may by received by the receivership defendants. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.
 

 11. All banks, brokers, savings and loan institutions, escrow agents, title companies, trusts, broker-dealers, other financial institutions or any other persons or entities which are served with a copy of this Order, shall cooperate with all reasonable requests of the Commission and the Receiver relating to implementation of this Order, including transferring funds at the Commission or the Receiver’s direction, allowing the Commission or the Receiver access to safe deposit boxes, and producing records related to Defendant Baragosh’s accounts.
 

 12. Copies of this Order may be served by any means, including facsimile transmission, upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of Defendant Baragosh that may be subject to any provision of this Order.
 

 13. Within ten (10) days after entry of this Order by the Court, Defendant Bara-gosh shall serve on the Commission a signed acknowledgment that he has been served with this Order.
 

 14. Beginning immediately and continuing until January 1, 2005, Defendant Baragosh shall notify the Commission of any change of his residential address or employment status within thirty (30) days of any change in his address or employment status.
 

 15. Any notice or materials Defendant Baragosh is required by this Order to give to the Commission shall be given to Lawrence Norton, Associate Director for Enforcement, Commodity Futures Trading Commission, 1155 — 21st Street, N.W., Washington. D.C. 20581.
 

 16. The injunction provisions of this Order shall be binding upon Defendant Baragosh, upon any person insofar as he or she is acting in the capacity of officer, agent, servant, employee and/or attorney of Defendant Baragosh, and upon any person who receives actual notice of the Order by personal service or otherwise insofar as he or she is acting in active concern or participation with Defendant Baragosh.
 

 17. If any provision of this Order, in whole or in part, is held invalid, the remaining provisions of the Order and the remaining portion of any provision held partially invalid shall not be affected by the holding.
 

 18. This Court shall retain jurisdiction over this action and of any ancillary or supplemental actions hereto, in order to, among other things, implement and carry out the terms of all orders, judgments, and decrees that may be entered herein, including those that may be necessary to assure compliance with this order of permanent injunction and final judgment.
 

 [1]
 

 . The case is before the Court on a First Amended Complaint. Currex was not named as a defendant in the original Complaint, but was added by the First Amended Complaint.
 

 [2]
 

 . The Commission has filed supporting affidavits, testimony, and documents in connection with the present motion, but Baragosh has not. Accordingly, there is no genuine issue of material fact. Even so, having reviewed the evidence, the Court is satisfied that the Commission’s proposed findings of fact are well-grounded.
 

 [3]
 

 . The Court will, however, award pre-judgment and post-judgment interest on the restitution award, as prayed by the Commission.
 

 [4]
 

 . The Court finds no basis for awarding prejudgment interest on the fine assessed in this case. Post-judgment interest on the award, however, will be granted as prayed by the Commission.