**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**Mark WEINBERG, Defendant.**

**No. CV 02–02084 RSWL.**

United States District Court,
C.D. California,
Western Division.

June 17, 2003.

Louis V. Traeger, Bernard J. Barrett, Jr, Commodity Futures Trading Commission, Los Angeles, CA, Richard Glaser,

John Dunfee, Commodity Futures Trading Commission, Washington, DC, for Plaintiff.

Mark Weinberg, Los Angeles, CA, Pro se.

Order For Entry of Default Judgment, Permanent Injunction and Ancillary Equitable Relief

LEW, District Judge.

On March 12, 2002, Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint to enjoin Mark Weinberg ("Weinberg" or "Defendant") from further violations of Sections 4b, 4o (1) and 6c of the Commodity Exchange Act, as amended ("Act"), 7 U.S.C. §§ 6b, 6o (1) and 13a–1 (1994). The Court signed a Consent Order of Preliminary Injunction on March 25, 2002 restraining Defendant from violating the Act. On July 5, 2002, Weinberg submitted an Answer. On July 17, 2002, the Court issued a "Notice re Scheduling Conference" ("Notice"). The Notice set October 21, 2002 for a mandatory scheduling conference and reminded parties of their obligation to disclose information, confer on a discovery plan and report to the Court in a manner consistent with F.R.C.P 26. Parties were warned that failure to comply might lead to the imposition of sanctions.

On October 21, 2002, the Court held a mandatory status/scheduling conference at which Weinberg failed to appear. At the conference, Commission counsel advised the Court that Weinberg refused to meet in accordance with F.R.C.P. 26, L.R. 16 and the Notice. On October 23, 2002 Weinberg was Ordered to Show Cause why his Answer should not be stricken and a default entered. Weinberg never responded. On January 13, 2003, the Court struck Defendant's Answer and entered a default.

The Commission has now submitted its Application for Entry of Default Judgment, Permanent Injunction and Ancillary Relief ("Application") pursuant to F.R.C.P. 55(b)(2) and L.R. 55. The Court has carefully considered the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Application and other written submissions of the Commission filed with the Court, and all oppositions thereto, and being fully advised in the premises, hereby

**GRANTS** the Commission's Application For Entry of Default Judgment, Permanent Injunction, and Ancillary Relief and enters findings of fact and conclusions of law finding Defendant liable as to all violations as alleged in the Complaint. Accordingly, the Court now issues the following Order for Default Judgment, Permanent Injunction and Ancillary Equitable Relief ("Order") against Defendant on issues of liability and the appropriate civil monetary penalties and restitution amounts.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### A. Jurisdiction

This Court has jurisdiction over the subject matter of this action and Defendant pursuant to Section 6c of the Act, 7 U.S.C. § 13a–1, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a–1, in that Defendant inhabits and transacts business in the Central District of California, and the acts and practices in violation of the Act occurred within this district, among other places.

## B. The Parties

*Commodity Futures Trading Commission* is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* and the regulations promulgated thereunder.

*Mark Weinberg* is an individual who resides in the City of Los Angeles, California. Defendant is not an infant, incompetent, serving in the military of the United States or subject to the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. §§ 501 *et seq.*

## C. The Prior Commission Order

On February 8, 1994, the Commission issued an Order ("CFTC Order") upholding an Administrative Law Judge finding that Weinberg had violated Sections 4b(a), 4c(b), 4d(*l*), 4o (1) and 9(a), 7 U.S.C. §§ 6b, 6c(b), 6d(1), 6o (1) and 13(a) (1988), and Sections 4.30 and 32.9 of the Commission's Regulations, 17 C.F.R. § 4.30 and 32.9 (1989). The Order directed that: 1) Weinberg's registration as a commodity trading advisor under the Act be revoked; 2) Weinberg cease and desist from engaging in violations of the provisions of the Act and Regulations charged; 3) Weinberg be prohibited from trading on, or subject to, the rules of any contract market for a period of 12 months; and 4) Weinberg pay a civil monetary penalty of $320,000.

## D. Weinberg's Activities Since the CFTC Order

### 1. Weinberg Defrauded Investors

Since in or about summer 1998, Weinberg solicited nine investors to invest $421,500 purportedly to be used in connection with commodity futures trades in an account at a Futures Commission Merchant ("FCM") on markets regulated by the Commission. Weinberg told investors that he was involved in commodity futures trades with Edwards Metcalf ("Metcalf").

Metcalf, who passed away in April 2001, was an heir to the Henry Huntington estate and, at one time, a wealthy man. Weinberg told these investors that he was offering a "no lose" investment opportunity. He represented that he and/or Metcalf had entered into a commodity futures trade, usually related to Japanese yen or other foreign currencies, in Metcalf's trading account at Merrill Lynch Futures, Inc. ("Merrill Lynch"), an FCM, that had appreciated in value. Weinberg claimed he and/or Metcalf did not have the funds to complete the successful trade, and that he purportedly needed investor money to complete the trade and to reap the guaranteed profits. Weinberg promised that the investors would share in the profits from the trade. In fact, no futures or other trading ever occurred in Metcalf's account at Merrill Lynch since he did not have a commodity futures trading account at Merrill Lynch.

The first investor solicited by Weinberg had previously traded with Weinberg in the early 1980s, knew Metcalf from a 1995 business dealing, and thought that Metcalf was still wealthy. In 1998, Weinberg falsely represented to the investor that he needed money to complete an already profitable commodity futures trade made in Metcalf's Merrill Lynch trading account, and that the transaction was a good way of making money without the investor having to trade commodity futures himself. To lure the investor, Weinberg showed him a purported Internal Revenue Service Form 1099–B showing Merrill Lynch trading with profits in excess of $3 million.

The investor agreed to give Weinberg $3,000 to $5,000 so that Weinberg could consummate the trade in Metcalf's account. Three to five days later the investor received funds that Weinberg claimed represented the investor's share of the purported profit. Over a period of several

weeks, the investor gave Weinberg additional funds in connection with a number of other purported futures transactions. Some of the purported trades were for small amounts; others were for between $100,000 and $150,000. After some of these purported trades, the investor received back a small amount of purported profits, but never the principal.

Six other investors were given similar inducements to provide Weinberg with funds. These other investors gave Defendant amounts ranging between $13,000 and $40,000 each. They never received any money back from Weinberg despite repeated requests and promises by Weinberg to repay. There is no evidence that any of these six investors' funds were ever traded.

### 2. Weinberg Engaged in Commodity Pool Fraud

Due to his perceived trading success, the first investor recommended Weinberg to two new investors. In or around October 1998, the three investors together gave Weinberg a total of approximately $440,000 as an investment. The two additional investors each invested $80,000 and the first investor re-invested approximately $280,000 to pool as investments with Weinberg in commodity futures trades. The three investors ("Pool") were told that their investment was "no-risk" because Weinberg had entered into profitable trades but did not have the money to complete the trades. In order to obtain the guaranteed profits, Weinberg needed money to pay for the trades. Weinberg also said that the trades were in Metcalf's Merrill Lynch trading account, in interest rates, foreign currencies or the S & P index because Metcalf was a wealthy person who had a long-standing relationship with Merrill Lynch that enabled him to get the maximum leverage during a commodities trade.

After Weinberg solicited money from the Pool, he represented to them that he had used their original pooled investment and their purported profits from the purported commodities trades in the Merrill Lynch trading account and had continued to make commodity futures trades in that account using the pooled money. During the first two months of 1999, Weinberg told the Pool that the value of the trading account had increased from a few hundred thousand dollars to approximately $6.5 million.

The Pool sought to recover their original investment and the profits Weinberg represented he had generated for them since March 1999, but Weinberg has continually failed to pay the money to them, consistently representing that some external factor prevented him from accessing the money. For example, at various times Weinberg claimed that "regulatory problems" related to his lack of a trading license denied him the ability to distribute the profits. At other times, Weinberg claimed either that Merrill Lynch had suspended trading in one or more of his accounts, and that that suspension acted as a bar to his obtaining access to the Metcalf trading account, or that other investors had competing interests in the Metcalf account. Weinberg warned that the Pool should not contact Merrill Lynch directly because it would cause the trading account to be frozen. Weinberg repeatedly provided account numbers for Merrill Lynch accounts and other financial institutions that proved to be non-existent. When the Pool finally contacted Merrill Lynch and found that no account existed, Weinberg claimed that the Merrill Lynch account was actually in Switzerland.

Weinberg eventually stated that he had moved the trading profits out of the Merrill Lynch account and that the money was in a Canadian account or in a Swiss bank

account. Weinberg claimed that the money was in Switzerland because a number of creditors were trying to get the money from him and he did not want them to find it.

Weinberg also provided the Pool with purported "settlement drafts" drawn on various financial institutions, including Merrill Lynch, as purported payment of money to the Pool or as collateral against the return of the money to the Pool. In fact, however, the "settlement drafts" were phony documents, and there were never sufficient funds in the account referenced in the "settlement draft" to cover the amount of such drafts or such accounts were non-existent.

All of Weinberg's claims as to the disposition of the funds were false.

### E. Violation of Sections 4b(a)(i) and (iii) of the Act: Fraud in Connection with Futures Contracts

■ Sections 4b(a)(i) and (iii) of the Act prohibit cheating and defrauding or attempting to cheat or defraud or willfully deceiving or attempting to deceive other persons in connection with commodity futures trading for or on behalf of such persons[1]. A violation of Section 4b(a) of the Act exists when the Commission demonstrates: (1) a misrepresentation or omis-

sion on the part of the defendant; (2) that the misrepresentation or omission has been made with scienter; and (3) that the misrepresentation or omission is material. *Hammond v. Smith Barney Harris Upham & Co.*, [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,659 (CFTC Mar. 1, 1990) (scienter is a necessary element of proof for a violation of Section 4b(a) of the Act), *aff'd sub nom.; CFTC v. Commonwealth Financial Group, Inc.*, 874 F.Supp. 1345 (S.D.Fla.1994), *vacated on other grounds*, 79 F.3d 1159 (11th Cir.1996) (in an enforcement proceeding under Section 4b(a) of the Act, reliance by customers is irrelevant).

■ Scienter may be established by showing that: (1) the defendant knew his misrepresentations were false and calculated to cause harm; or (2) the defendant made the representations with a reckless disregard for their truth or falsity. *Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742 (D.C.Cir.1988) (recklessness is sufficient to satisfy scienter requirement).

■ A statement is material if "it is substantially likely that a reasonable investor would consider the matter important in making an investment decision." *CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F.Supp.2d 676 (D.Md.2000) *aff'd in rele-*

---

1.  Section 4b(a)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(i) and (iii), provides that:

    It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transac-

tion in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—
    (i) to cheat or defraud such other person;
    * * *
    (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, in regard to any act of agency performed with respect to such order or contract for such person. .

*vant part, vacated in part* by *CFTC v. Baragosh,* 278 F.3d 319 (4th Cir.2002), *cert. denied Baragosh v. CFTC,* 537 U.S. 950, 123 S.Ct. 415, 154 L.Ed.2d 296 (2002); *United States v. Smith,* 155 F.3d 1051 (9th Cir.1998); *Kaplan v. Rose,* 49 F.3d 1363 (9th Cir.1994), *cert. denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995); *SEC v. Blinder, Robinson & Co., Inc.,* 542 F.Supp. 468 (D.Colo.1982) (citing *Affiliated Ute Citizens of Utah. v. U.S.,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)); *Grossman v. Novell, Inc.,* 120 F.3d 1112 (10th Cir.1997); *Sudol v. Shearson Loeb Rhoades, Inc.,* [1984–1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,748 at 31,119 (CFTC Sept. 30, 1985) (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Defendant violated Section 4b(a)(i) and (iii) of the Act by misappropriating investor funds. In addition, Weinberg violated Section 4b(a)(i) and (iii) of the Act by making misrepresentations and omissions to investors.

### 1. Misappropriation of Investor Funds

■ Weinberg violated Sections 4b(a)(i) and (iii) by using investor funds for his personal use and benefit. Investor funds were given to Weinberg for use in completing various commodity transactions for or on behalf of customers, including transactions allegedly occurring in a Merrill Lynch trading account. However, there is no evidence of any trades or Merrill Lynch trading account. Moreover, Weinberg never returned the funds provided to him by the investors. Defendant's misappropriation of funds entrusted to him for trading purposes is "willful and blatant fraudulent activity" that clearly violates Section 4b(a) of the Act. *CFTC v. Noble Wealth Data Info. Serv., Inc.,* 90 F.Supp.2d 676 (D.Md.2000) (defendants defrauded investors by diverting investor funds for operating expenses and personal use); *CFTC v. Clothier,* 788 F.Supp. 490 (D.Kan.1992) (a violation of Section 4o (1) of the Act includes the fraudulent misappropriation of customers' funds entrusted to broker for trading purposes); *CFTC v. Skorupskas,* 605 F.Supp. 923 (E.D.Mich.1985) (defendant misappropriated customer funds entrusted to her by soliciting investor funds for trading and then trading only a small percentage of those funds, while disbursing the rest of the funds to other investors, herself, and to her family); *In re Lincolnwood Commodities, Inc.,* [1982–1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,986 at 28,255 (1984) (Commission affirmed holding that defendant violated Section 4b when he "diverted to his own use funds entrusted to him by or on behalf of his customers"); *CFTC v. Muller,* 570 F.2d 1296 (5th Cir.1978) (preliminary injunction affirmed where CFTC made a prima facie showing that defendant had misappropriated customer funds in violation of Act).

### 2. Misrepresentations to Investors

■ Weinberg violated Sections 4b(a)(i) and (iii) by making false and misleading representations as to the existence and guaranteed profitability of the futures trades for which he solicited customer funds, and as to the amount and location of the investors' money and his ability to access the funds. Weinberg told numerous customers that he was offering a "no lose" investment opportunity when in fact no such investment existed. He repeatedly stated that he had entered into profitable futures trades in Metcalf's trading account at Merrill Lynch. He claimed that neither he nor Metcalf had the funds to complete the successful trade, and, therefore, in order to reap the guaranteed profits, he needed investor money to pay for the completion of the trade.

However, neither Weinberg nor Metcalf had a futures trading account at Merrill

Lynch, and there is no evidence that any of the purported profitable trades described by Weinberg ever existed. Such misrepresentations are material and constitute fraud with respect to futures transactions under Sections 4b(a)(i) and (iii) of the Act. *See, e.g., CFTC v. Rosenberg*, 85 F.Supp.2d 424 (D.N.J.2000) (finding fraud where defendant represented that he would open a trading account and then did not do so); *CFTC v. Skorupskas*, 605 F.Supp. at 932–33 (E.D.Mich.1985) (finding that defendant's failure to open trading account and failure to make trades in accordance with her representations constituted fraud in violation of CEA). Moreover, by guaranteeing profits to his investors, Weinberg made material misrepresentations that constitute fraud under Sections 4b(a)(i) and (iii) of the Act. *CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F.Supp.2d at 685 (defendants' knowledge that profit claims were false constituted fraud within the meaning of the Act); *CFTC v. U.S. Metals Depository Co.*, 468 F.Supp. 1149 (S.D.N.Y.1979) (misrepresentations regarding profitability of investment); *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. 911 (S.D.N.Y.1977) (defendants made misrepresentations to prospective customers regarding the profitability of their customers' investment).

Similarly, Weinberg made false and misleading statements as to the amount and location of the investors' money and his ability to access the funds. He provided one or more investors with purported "settlement drafts" drawn on various financial institutions, including Merrill Lynch, as purported payment of money to the investor or as collateral against the return of the money to the investor. In fact, however, the "settlement drafts" were phony documents, and there were never sufficient funds in the account referenced in the "settlement draft" to cover the amount of such drafts. Account numbers provided by Weinberg for Merrill Lynch accounts and other financial institutions proved to be non-existent. When the Pool contacted Merrill Lynch and found that that no account existed, Weinberg claimed that the account was actually in Switzerland.

Moreover, after Weinberg solicited money from the Pool, he represented to them that he had pooled their original investments and their profits from the commodities trades in the Merrill Lynch trading account and had continued to make commodity futures trades in the Merrill Lynch account using the pooled money. During the first two months of 1999, Weinberg told the Pool that the value of the trading account had increased from a few hundred thousand dollars to approximately $6.5 million. Weinberg said that the money was in the Merrill Lynch account. At no time has Weinberg provided an accounting of its whereabouts. Such misrepresentations are material and constitute fraud with respect to futures transactions under Sections 4b(a)(i) and (iii) of the Act. *See, e.g., CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F.Supp.2d at 685; *CFTC v. U.S. Metals Depository Co.*, 468 F.Supp. at 1160; *CFTC v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. at 916.

**F. Violation of Section 4o (1) of the Act: Fraud by a Commodity Pool Operator**

■ Section 4o (1) of the Act broadly prohibits fraudulent conduct by a Commodity Pool Operator ("CPO").[2] This

---

2. Section 4o (1) of the Act provides that:
   (1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:
   (A) to employ any device, scheme, or artifice to defraud any client or participant or pro-

section applies to all CPOs whether registered, required to be registered, or exempted from registration. *CFTC v. Skorupskas*, 605 F.Supp. at 932–933.

▉ A CPO is defined as any person who is engaged in the business that is of the nature of an investment trust, syndicate or similar form of enterprise, who, in connection therewith, solicits, accepts or receives from others, funds, securities or property, for the purpose of trading in any commodity for future delivery, on or subject to the rules of any contract market. Section 1a(5) of the Act, 7 U.S.C. § 1 (1994). Weinberg has acted as a CPO by soliciting, accepting and receiving funds to be pooled for the purpose of trading commodity futures in the Merrill Lynch account.

The same conduct by Weinberg that violates Section 4b(a)(i) and (iii) also violates Section 4o (1). *In re R & W Technical Services, Ltd., et al.*, [1998–1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,582 at 47,745 (CFTC March 16, 1999), *aff'd in part, R & W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165 (5th Cir.2000) (since the Commission found that respondent violated Section 4b(a) of the Act, no further analysis was needed to conclude that respondent also violated Section 4o (1)). Moreover, a violation of Section 4o (1)(B) does not require scienter. Unlike Section 4b of the Act and 4o (1) of the Act, the language of Section 4o (1)(B) does not expressly require "knowing" or "willful" conduct as a prerequisite for establishing liability. In this regard, the Commission has held that "[a]lthough scienter must be proved to establish a violation of Section 4b and 4o (1)(A), it is not necessary to establish a violation of Section 4o (1)(B)." *In re Kolter*, [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,262 at

42,198 (CFTC Nov. 8, 1994), *citing Messer v. E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir.1988).

## G.  Violation of 6c of the Act: The Prior CFTC Order

▉ Under Section 6c(c) of the Act, 7 U.S.C. 13a–1, this Court has the authority to enforce the prior Commission Order. In pertinent part, Section 6c(c) states "the district courts of the United States...shall have jurisdiction to...command[ing] any person to comply with the provisions of this Act, or any rule, regulation or order of the Commission thereunder."

The same conduct engaged in by Weinberg which violated Sections 4b(a)(i) and (iii) and 4o (1), 7 U.S.C. 6b(a)(i) and (iii) and 6o (1), as described above in Sections D1 and D2, constitute a violation of the prior Commission Order which had ordered him to cease and desist from violating these same provisions of the Act.

## H.  Need for a Permanent Injunction and Other Ancillary Relief

Pursuant to section 6c, the Commission has made a showing that Defendant has engaged in acts and practices which violate Sections 4b(a)(i) and (iii), 4o (1) and 6c of the Act, 7 U.S.C. §§ 6b(a)(i) and (iii), 6o (1) and 13a–1. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendant will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act. The imposition of other ancillary equitable relief is required to comply with the basic objectives of the Act. Therefore:

**IT IS HEREBY ORDERED** that:

---

spective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit

upon any client or participant or prospective client or participant.

Weinberg, all persons insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of Defendant, and all persons insofar as they are acting in active concert or participation with Defendant who receive actual notice of this order by personal service or otherwise, shall be prohibited and restrained from directly or indirectly:

1. in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other persons, where such contract for future delivery was or could be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof,

  a) cheating or defrauding or attempting to cheat or defraud other persons;

  b) willfully deceiving or attempting to deceive other persons,

in violation of Section 4b(a)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(i), and (iii).

2. while acting as a CPO, as defined in Section 1a(4) of the Act

  a) employing a device, scheme or artifice to defraud pool participants and prospective pool participants,

  b) engaging in a transaction, practice or course of business that operates as a fraud or deceit upon pool participants and prospective pool participants,

in violation of Sections 4o (1)(A) and 4o(1)(B) of the Act, 7 U.S.C. §§ 6o (1)(A) and 6o(1)(B).

3. engaging in any conduct and activities specifically prohibited by the provisions of the CFTC Order issued against him, including but not limited to, engaging in fraud in connection with futures contracts, as set forth in Section 6c of the Act, 7 U.S.C. § 13a–1 (1994).

**IT IS FURTHER ORDERED** that:

1. Defendant is ordered to pay restitution in the amount of $570,198.79 ("Restitution Obligation"), which includes a principal amount of $421,500, plus prejudgment interest in the amount of $148,698.79 as of April 12, 2003. Postjudgment interest shall accrue on the Restitution Obligation at the rate of 1.46%, pursuant to 28 U.S.C. § 1961;

2. Defendant shall pay the Restitution Obligation set forth above in Paragraph 1 to the National Futures Association ("NFA"), which shall be designated as Monitor for the purpose of distributing any funds paid as restitution, for the period beginning with the date of entry of this Order and continuing until distribution of the complete Restitution Obligation called for by this Order. The Commission will provide the Monitor with a list of persons ("List of Investors"), attached hereto as Exhibit 1, to whom restitution shall be made. Omission from the List shall in no way limit the ability of any investor to seek recovery from Defendant or any other person or entity. Further, the amounts contained in the List shall not limit the ability of any investor to prove that a greater amount is owed from Defendant or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any investor that exist under state or common law. Upon the receipt by the NFA of any funds paid as restitution pursuant to this Order, the NFA shall notify the Commission of the receipt of any such funds. Within 30 days of any such written notice, the Commission shall submit to the Court a proposed plan for the distribution of such funds;

3. Defendant shall submit restitution payments to the Monitor at the following

address, The National Futures Association, Attention: Daniel A. Driscoll, 200 W. Madison Street, Chicago, IL 60606;

4. For violations of Section 4b and 4o (1) of the Act, Plaintiff Commission is awarded judgment against Defendant of a civil monetary penalty in the amount of $1,264,500, which represents triple the amount that Defendant stole from investors;

5. Defendant shall pay post-judgment interest on the civil monetary penalty amount thereon from the date of this Order until the civil monetary penalty amount is paid in full at the rate of 1.46%, pursuant to 28 U.S.C. § 1961;

6. Defendant shall submit payment of the civil monetary penalty to the Commodity Futures Trading Commission, Division of Enforcement, 1155 21st Street, N.W., Washington, D.C. 20581 to the attention of Ms. Dennese Posey. Payment must be made by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order, made payable to the Commodity Futures Trading Commission. The payment(s) shall include a cover letter that identifies Defendant and the name and docket number of this proceeding. Defendant shall simultaneously transmit a copy of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, N.W., Washington, D.C. 20581;

7. If any provision of this Order, or the application of any provision or circumstance, is held invalid, the remainder of the Order, and the application of the provision to any other person or circumstance, shall not be affected by the holding;

8. Copies of this Order may be served by any means, including facsimile transmission, upon any financial institution, or any other entity or person that may have possession, custody or control of any docu-

ments or assets of Defendant that may be subject to any provision of this Order;

9. Within seven (7) days after the entry of this Order, the Defendant shall serve upon the Commission a signed acknowledgement that he or it has been served with the Order;

10. Defendant shall serve any notices or materials required by this Order, and any applicable notices required by the Federal Rules of Civil Procedure, upon the Commission by delivering a copy to Richard Glaser, Chief Trial Attorney, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, NW, Washington, D.C. 20581;

11. Defendant shall prepare and file with the Court, within thirty (30) days of the date of this Order, an accounting for the period January 1, 1998 to the date of such accounting. The accounting shall include the following: (1) all of Defendant's assets and liabilities, identifying their value, nature and location, including but not limited to all real and personal property, and all bank, credit union, checking, commodity or security accounts, either directly or indirectly under the possession or control of Defendant, wherever situated; and (2) transfers of real and personal property; the accounting shall include a detailed explanation of the circumstances under which any documentary evidence (including computer data) which would support the foregoing accounting has been destroyed, lost, misplaced or otherwise become unavailable. The accounting shall be made under oath attesting to a full and complete accounting and shall be signed by Defendant. A copy of the accounting shall be provided to the plaintiff;

12. This Court shall retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for addi-

tional relief within the jurisdiction of the Court;

14. All aspects of the Court's Order remain in full force and effect, unless specifically lifted or altered in this Order or any subsequent Order of this Court;

15. There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Order.

### Exhibit 1

**List of Investors**

| | |
|---|---|
| Gary Apfel | $ 80,000 |
| Paul Chamberlain | $120,000 |
| Eugene Fisher | $ 13,000 |
| Linda Hibbard | $ 40,000 |
| Katie Micronis | $ 8,700 |
| Murray Moss | $ 41,000 |
| Henry Schiffer | $ 15,000 |
| Hushmand Sohaili | $ 80,000 |
| Christopher Yewdall | $ 23,800 |
| | |
| Total | $421,500 |